Case No. 25-3037

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

SOFIDEL AMERICA,

Petitioner,

v.

VINCENT N. MICONE, III, Acting Secretary of Labor,

Respondent.

## BRIEF OF PETITIONER SOFIDEL AMERICA

ON APPEAL FROM THE OCCUPATIONAL SAFETY AND HEALTH
REVIEW COMMISSION

SHARON D. CALHOUN
ADMINISTRATIVE LAW JUDGE

CURPHEY & DERSCH, PA
William E. Curphey (FL 0386741)
816 137th St NE
Bradenton, FL 34212-2753
Telephone: 727-599-4785
billcurphey@gmail.com

FISHER & PHILLIPS LLP
J. Micah Dickie (GA 324015)
1230 Peachtree St NE, Ste 3300
Atlanta, Georgia 30309
Telephone: 404-260-3419
mdickie@fisherphillips.com

*Counsel for Petitioner,*
*Sofidel America*

# I.    CORPORATE DISCLOSURE STATEMENT

Pursuant to 6 Cir. R. 26.1, ***Sofidel America*** makes the following disclosures:

1.    Is said party a subsidiary or affiliate of a publicly owned corporation?

No

2.    Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?

No.

## II.  **TABLE OF CONTENTS**

I.    CORPORATE DISCLOSURE STATEMENT ................................................... i

II.   TABLE OF CONTENTS ................................................................... ii

III.  TABLE OF AUTHORITIES ................................................................ iii

IV.   STATEMENT IN SUPPORT OF ORAL ARGUMENT ................................ 1

V.    JURISDICTIONAL STATEMENT .................................................... 1

VI.   STATEMENT OF THE ISSUES PRESENTED ................................... 2

VII.  STATEMENT OF THE CASE ...................................................... 3

VIII. SUMMARY OF ARGUMENT .................................................... 10

IX.   ARGUMENT ..................................................................... 11

  A.  Citation 1 Item 3 .......................................................... 12

    i.   The ALJ Erred in Finding That Unjamming Was a Pre-Production Activity
    and Not Integral to Production. ............................................. 13

    ii.  There Is Substantial Evidence That Petitioner Meets the Other Elements
    of the Minor Service Exception During One-Person Jogging. ........................ 19

    iii. There Is Not Substantial Evidence That the Cited Standard Applies
    During One-Person Jogging Or Two-Person Jogging. .................................. 22

    iv.  There Is Not Substantial Evidence That Petitioner Had Knowledge of a
    Violation. ................................................................... 25

      1.  Petitioner Had No Actual Knowledge. ................................... 25

      2.  Petitioner Had No Constructive Knowledge. ............................. 28

    v.   Any Violation of 29 CFR 1910.147(c)(4)(i) Is the Result of Employee
    Misconduct, Particularly While Performing a Prohibited Two-Person Jog. .... 29

  B.  Citation 1 Item 4 .......................................................... 31

    i.   The LOTO Standard Does Not Apply. ..................................... 31

    ii.  The Secretary Has Not Met Her Burden for Citation 1 Item 4. ............. 32

X.    CONCLUSION .................................................................... 32

XI.   CERTIFICATE OF COMPLIANCE ................................................ 34

XII.  CERTIFICATE OF SERVICE ...................................................... 35

APPENDIX

## III. TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aerospace Testing All.*,
    2020 CCH OSHD ¶ 33807, 2020 WL 5815499 (No. 16-1167,
    2020) ......................................................................................................21

*Cleveland Constr., Inc. v. Occupational Safety & Health Rev.*
    *Comm'n*,
    201 F.3d 440, 1999 WL 1253100 (6th Cir. 1999) .............................11

*Danis-Shook Joint Venture XXV v. Sec'y of Lab.*,
    319 F.3d 805 (6th Cir. 2003) .............................................................30

*Dayton Tire*,
    23 BL OSHC 1247, 2010 WL 3701876 (No. 94-1374, 2010)
    *overruled in part on other grounds by Dayton Tire v. Sec'y of Lab.*,
    671 F.3d 1249 (D.C. Cir. 2012).................................................12, 13

*Gen. Motors Corp.*,
    17 BL OSHC 1217, 1995 WL 247469 (No. 91-2973, 1995) ............23

*Int'l Union, United Auto., Aerospace & Agr. Implement Workers of*
    *Am., UAW v. Occupational Safety & Health Admin.*,
    938 F.2d 1310 (D.C. Cir. Sept. 16, 1991).........................................14

*JPC Group, Inc.*,
    22 BL OSHC 1859, 2009 WL 2567337 (No. 05-1907, 2009) ...........12

*Loper Bright Enters. v. Raimondo*,
    *603 U.S. 369, 144 S. Ct. 2244, 219 L.Ed.2d 832 (2024)* ...................18

*Matsu Alabama, Inc.*,
    25 BL OSHC 1952, 2015 WL 6941348 (No. 13-1713, 2015) (ALJ)...........14, 15

*In re MCP No. 185*,
    124 F.4th 993 (6th Cir. 2025) ...........................................................18

*Nat'l Lab. Rels. Bd. v. Macomb*,
    No. 23-1335, 2024 WL 4240545 (6th Cir. Sept. 19, 2024)................18

*Quebecor World - Salem Div., & Its Successors*,
   19 BL OSHC 1627, 2001 WL 1083763 (No. 01-0031, 2001) (ALJ)...........19, 23

*Reich v. Gen. Motors Corp.*,
   89 F.3d 313 (6th Cir. 1996) ................................................................23

*Shaw Areva Mox Servs., LLC*,
   23 BL OSHC 1821, 2012 WL 525155 (No. 09-1284, 2012) ............................28

*Tennessee v. Becerra*,
   131 F.4th 350 (6th Cir. 2025) ................................................................18

*W.G. Yates and Sons Constr. Co. Inc. v. Occupational Safety &*
   *Health Rev. Comm'n*,
   459 F.3d 604 (5th Cir. 2006) ............................................................25

*Westvaco Corp.*,
   16 BL OSHC 1374, 1993 WL 369040 (No. 90-1341, 1993) ...........14, 15, 16, 17


**Statutes**

OSH Act, 29 U.S.C. §§ 651, 658, 660, *et seq.*................................................1, 2, 27

**Other Authorities**

29 C.F.R. § 1910.147 (2011) ............................................................1, 12

29 C.F.R  § 1910.147(a)(2)..................................................................14

29 C.F.R. § 1910.147(c)(4)(i) ................................................................2, 12, 32

29 C.F.R. § 1910.147(c)(7)(i)(A)................................................................2, 31, 32

29 C.F.R. § 2200.91 (2019) ................................................................2

54 FR 36644, 36662 (September 1, 1989).............................................................18

6 Cir. R. 26.1 ................................................................i

Sixth Circuit Rule 32(b)................................................................34

CPL 02-00-147 (Feb. 11, 2008)................................................................20

CPL 02-00-147, ch. 3, sec. IV, pp. 3-25-3-32, R-23 (Feb. 11, 2008) ....................15

Federal Rules of Appellate Procedure Rule 32(a)(5)...............................................34

Federal Rules of Appellate Procedure Rule 32(a)(7)(B) .........................................34

Federal Rules of Appellate Procedure Rule 32(f)....................................................34

Federal Rules of Appellate Procedure Rule 36(a)(6)...............................................34

OSHA https://www.osha.gov/laws-regs/standardinterpretations/2003-06-11 (last visited April 3, 2025)........................................................17

OSHA, https://www.osha.gov/laws-regs/standardinterpretations/2004-04-07 (last visited April 3, 2025)........................................................18

## IV. STATEMENT IN SUPPORT OF ORAL ARGUMENT

Petitioner requests oral argument to assist the Court in its decisional process, particularly regarding the ambit of production activities and the minor service exception to the lockout/tagout regulation promulgated by the Occupational Safety and Health Administration ("OSHA"). Oral argument is necessary because this case presents unique and important substantive issues in the development of the law under the OSH Act, 29 U.S.C. § 651, *et seq.* Specifically, the Secretary of Labor's interpretation of what constitutes production activities, and the decision by the Occupational Safety and Health Review Commission ("Commission") in this matter, represent a shift in the scope of coverage for 29 C.F.R. § 1910.147 (2011), and the Court's determination will have broad impact on a wide-range of employers that perform service and maintenance, particularly employers in the paper industry that unjam paper and other materials during their processes. Furthermore, oral argument will allow the parties the opportunity to address any questions the Court may have concerning the specifics of the parties' positions and to clarify and/or expand any arguments set forth in the parties' respective briefs.

## V. JURISDICTIONAL STATEMENT

On February 14, 2023, OSHA issued a Citation and Notification of Penalty to Petitioner, alleging, in relevant part, violations of 29 C.F.R. § 1910.147. On October 17, 2024, Administrative Law Judge ("ALJ") Sharon D. Calhoun issued a Decision

and Order affirming, in relevant part, Citation 1 Item 3 and Citation 1 Item 4 of the Citation and Notification of Penalty. (A-001). On November 15, 2024, Petitioner filed a Petition for Discretionary Review with the Commission. (A-024). The Commission had subject matter jurisdiction over that action arising under the laws of the United States pursuant to 29 C.F.R. § 2200.91 (2019). On November 29, 2024, the Commission issued a Notice of Final Order deciding not to direct the case for review and directing that the decision of the ALJ become a final order of the Commission on November 27, 2024. (A-042).

Thereafter, on January 23, 2025, Petitioner timely filed a Petition for Review of the Commission's final order with this Court. (A-044). This Court has jurisdiction pursuant to Section 11 of the Occupational Safety and Health Act of 1970.

## VI.   STATEMENT OF THE ISSUES PRESENTED

**A.**   Whether the Commission erred in law and in fact in finding that Petitioner violated 29 C.F.R. § 1910.147(c)(4)(i) while clearing jammed material from the R88 Line Gambini Rewinder without first performing lockout/tagout.

**B.**   Whether the Commission erred in finding that Petitioner violated 29 C.F.R. § 1910.147(c)(7)(i)(A) when its employees were trained only as affected employees and not authorized employees when they clear jammed material from the R88 Line Gambini Rewinder without performing lockout/tagout.

## VII. STATEMENT OF THE CASE

At its Circleville, Ohio, facility ("Worksite"), Petitioner makes paper products such as toilet paper and paper towels. (A-288; A-074 [ Tr. 26:6-14, 27:9-14]). The paper products are run through machinery operated by Petitioner's employees. One of these machines is the R88 Line Gambini Rewinder ("R88 Rewinder"). (A-288). At the worksite, paper is delivered to the converting department, and the converting department converts the paper to finished goods. (A-074 [Tr. 54:1-7]). Giant paper rolls are delivered to production lines, loaded onto an unwinder for a particular line, fed through the rewinder cabinet of the line, then transferred to an accumulator for storage. (A-074 [Tr. 55:2-14]). The paper then goes into the log saw to determine the finished diameter or width of the finished product and sent for packaging. (A-074 [Tr. 55:2-14]).

On September 21, 2022, non-management employee Christian Hill ("Hill") went inside an interlocked door into the R88 Rewinder to clear jammed material. (A-288). A second non-management employee, Dezmond Perkins ("Perkins"), accompanied Hill. (*Id.*). Perkins operated the process controls to rotate the machine rollers while Hill began to remove the jam by hand. (*Id.*). Hill's left hand was caught in a pinch point and injured between a roller and a stationary guide plate on the rewinder head unit of the R88 Rewinder. (A-288). Hill's accident happened during reverse, two-person jogging. (A-074 [Tr. 233:24-236:25, 266:12-20, 57:1-4]; A-304

3

[3:00]; A-288). Hill's employment with Petitioner was terminated, like at least three others before him, for performing a prohibited two-person jog after he returned to work from his injuries. (A-074 [Tr. 147:15-148:13, 154:18-155:11]; A-156 [Tr. 434:3-20]).

Wrap-ups, jams, and paper breaks happen during the production process anywhere from ten times per day per machine to every ten or fifteen minutes per machine per twelve-hour shift, and when running toilet paper, a wrap-up happens a minimum of once per hour. (A-074 [Tr. 83:25-84:25, 86:23-87:4, 223:11-14, 294:2-296:19]; A-156 [Tr. 376:20-377:17, 435:24-8]; A-221). Having paper run through the R88 Rewinder, having breaks, and repairing breaks are integral to the production of toilet paper and other products that Petitioner processes on the R88 Rewinder and part of the normal production process, and Petitioner's efficiency target is forty percent (40%) during production runs. (A-074 [Tr. 293:23-296:22]; A-156 [Tr. 496:7-497:7]). Paper breaks, rethreading after a jam, and unjamming material such as paper and cores is part of the production process. (A-074 [Tr. 294:2-10]; A-156 [Tr. 496:1-16]). The Overall Equipment Efficiency ("OEE") of the converting department machines at the worksite is thirty-five percent (35%), (A-156 [Tr. 495:4-25]), with the goal and the industry standard being forty percent (40%), (A-074 [Tr. 296:17-18]).

When a jam occurs, the HMI will let the operator know which section of the machine has the jam. (A-074 [Tr. 88:9-23]). Controls on the R88 Rewinder are only able to be used once an employee swipes a badge. (A-074 [Tr. 76:9-24]). Primary operators go inside the R88 Rewinder to clear jams through interlocked doors on the R88 Rewinder. (A-074 [Tr. 66:19, 67:6-9, 71:24-25; 89:9-15]; A-304). To enter the interlocked door, employees must push a button, the machine de-energizes, there is a delay, and then the door can be opened. (A-074 [Tr. 67:10-14, 77:10-18]; (A-156 [Tr. 498:24-499:17]; A-304 [2:37]). Opening the interlocked door on the R88 Rewinder deenergizes the entire machine except for a jog function, and there is no unexpected energization possible. (A-074 [Tr. 67:15-19, 208:22-3]; A-156 [Tr. 372:12-16, 497:19-24]). The only operation mode for the R88 Rewinder while the interlocked door is open is that it can be jogged very slowly, at a creep speed. (A-074 [Tr. 209:4-5, 130:19-23]; A-156 [Tr. 372:12-16]). Jogging moves the roller in the area of the accident away from a pinch point. (A-074 [Tr. 145:16-146:13, 225:18, 257:11-21]; A-293).

There are three jog modes: forward at the control panel, forward with a deadman switch, and reverse at the control panel. To perform the jogging function at the control panel first the R88 Rewinder must be reset, then an employee must go back to the HMI panel and ensure the jog button can be used, then go back into the machine and press the reset button on the control panel. (A-074 [Tr. 120:10-25]; A-

5

293). When the jog button is pushed at the panel inside the R88 Rewinder, or when it is pushed via the deadman switch, an audible alarm sounds three times, there is a delay, and then the machine can be jogged while holding the button down. (A-074 [Tr. 120:24-121:10, 145:1-11, 254:1-21]; A-156 [Tr. 439:9-15, 497:25-498:9, 499:18-500:10]). The R88 Rewinder also has a deadman forward jog switch so that employees can reach other parts of the machine and jog it as necessary while holding the deadman jog switch, and if the employee releases the deadman switch, the jogging stops. The deadman switch also moves the rollers away from the pinch point. (A-074 [Tr. 122:18-124:15, 144:16-145:11, 145:16-146:13, 254:1-21, 257:11-21]; A-293). Reverse jogging can only be done at the panel, not via the deadman switch, and, because of distance, that employee does not have access to any zone of danger while that employee is hitting the reverse jogging button on the control panel. (A-074 [Tr. 146: 19-147:2, 254:17-24, 276:12-23, 278:11-24, 292:3-19]; A-156 [Tr. 439:20-440:22]; A-293). Employees expect the machine to jog in reverse immediately upon hitting the reverse job button. (A-074 [Tr. 256:1-6]). The only evidence of the frequency of reverse jogging is that it is "hardly ever use[d]." (A-074 [Tr. 236: 9-14]). Jogging is necessary when a wrap-up or jam occurs to remove the wrap-up or jam. (A-074 [Tr. 225:11-14]; A-156 [Tr. 435:24-436:20, 484:2-7]). Employees use the jogging mechanism to unjam the machine without using their hands and using the jog function repeatedly. (A-074 [Tr. 130:3-11]). Paper or other

material removed from the machine is then removed by hand when needed while the machine is not running, and often the paper or material is on the floor when picked up and removed by hand. (A-074 [Tr. 252:6-24]).

Employee orientation at Petitioner consisted of four or five days of classroom training, and it covered safety topics. (A-074 [Tr. 221:18-222:2]; A-156 [Tr. 464:5-465:6]; A-313; A-315; A-319; A-322). Jogging of any kind is a one-person task, and, prior to the accident, Petitioner employees were prohibited from performing two-person jogging. (A-074 [Tr. 200: 15-201:16, 211:5-25, 279:21-280:3]; A-156 [Tr. 376:1-3]). Hill was trained on this rule in orientation and other safety training. (A-074 [Tr. 200: 15-201:16, 211:5-25, 279:21-280:3]; A-156 [Tr. 376:1-3]). Petitioner conducts audits and inspections at the Worksite. (A-074 [Tr. 159:22-25]). Hill's accident happened during reverse, two-person jogging. (A-074 [Tr. 233:24-236:25, 266:12-20, 57:1-4]; A-304 [3:00]; A-288). Prior to the accident, Petitioner had terminated or disciplined several employees for performing a two-person jogging in violation of Company policy. (A-074 [Tr. 154:18-155:11, 180:1-182:3]; A-307). Petitioner's supervisors had never seen two people inside the interlocked doors trying to unjam a machine, or two-person jogging, in the past few years. (A-074 [Tr. 89:16-90:12, 280:4-8, 281:6-25]; A-156 [Tr. 457:1-21,329:13-23, 410:19-25, 414:15-415:10, 418:13-22]; A-258; A-263). Mr. Hill's supervisor at the R88 Rewinder was Adam Bixler. (A-074 [Tr. 230:3-12]). Bixler would not come over

often during jams, and the only evidence that Bixler knew Hill had ever performed two-person jogging in the six months leading up to Hill's accident was ex-employee Hill's testimony. (A-074 [Tr. 231:4-8, 231:19-232:4, 245:2-13]; A-156 [Tr. 414:15-415:10, 418:13-22]). While Bixler told the CSHO during the inspection that two-person jogging had occurred prior to the accident, Bixler testified that this practice stopped in 2019. (A-156 [Tr. 428:7-429:11]). There is no evidence showing that this jogging happened within the six months leading up to the Citation, other than two-person, reverse jogging during the accident and as described in ex-employee Hill's testimony. (A-156 [Tr. 329:13-23, 410:19-25, 414:15-415:10, 418:13-22]). Bixler explicitly denied that he performed two-person jogging after early 2019 and denied that he had done it with Hill. (A-156 [Tr. 429:6-11]). Bixler explicitly denied that he observed Hill performing two-person jogging. (A-156 [Tr. 433:25-434:2]).

As a result of the Hill's accident, OSHA conducted an inspection of the worksite. (A-288). Lauren Eberts is the Compliance Safety and Health Officer ("CSHO") who conducted the inspection following the accident which occurred on September 21, 2022. (*Id.*). Petitioner produced training materials for LOTO plant-wide to OSHA during the inspection, and evidence shows that employees were trained on LOTO. (A-156 [Tr. 372:5-11, 435:4-19, 481:18-23]; A-207). Operators are trained on lockout but not as authorized employees. (A-074 [Tr. 142:13-22]). The only evidence of a LOTO training violation for Citation 1 Item 4 related to

training is that OSHA considers Petitioner operators of the R88 Rewinder to be authorized employees, whereas Petitioner considered them affected and trained them as affected for LOTO purposes; Petitioner trained the employees it considered authorized employees pursuant to the LOTO standard. (A-156 [Tr. 415:11-416:15, 442:3-18, 481:18-23]).

OSHA issued a Citation and Notification of Penalty to Petitioner as a result of the inspection. (A-288). Petitioner timely filed a Notice of Contest regarding the Citation and Notification of Penalty in which it contested all issues and matters relating to the Citations, including abatement dates and proposed penalties. (A-288). Complainant withdrew Citation 1 Item 1, Citation 1 Item 2a, Citation 1 Item 2b, and Citation 1 Item 5 at the beginning of the hearing. (A-074 [Tr. 16:13-17:25]). In the ALJ's Decision and Order dated October 17, 2024, in relevant part, the Court affirmed Citation 1 Item 3 and Citation 1 Item 4 against Petitioner.

Petitioner timely sought discretionary review before the full Commission of the ALJ's Decision and Order regarding Citation 1 Item 3 and Citation 1 Item 4 because it is contrary to law and Commission precedent, including numerous findings of fact that are not supported by a preponderance of the evidence and was an abuse of discretion. As of November 29, 2024, the Commission did not direct the Petition for review. This appeal followed.

## VIII. **SUMMARY OF ARGUMENT**

First, the ALJ erred as a matter of law and misapplied Commission precedent in finding that the unjamming of the R88 Rewinder did not occur during production and in finding that unjamming was not integral to the use of the equipment for production.

Second, substantial evidence shows that the minor service exception to the LOTO standard applies to one-person jogging because unjamming paper is minor, repetitive, done during production as noted above, integral to the production process, and done with alternative protective measures—an interlocked door—to ensure employees are not exposed to a hazard from unexpected energization.

Third, there is not substantial evidence that Petitioner had knowledge of the violative condition, that the cited LOTO standards apply, or that an employee was exposed to unexpected energization during single-person jogging for Citation 1 Item 3. The ALJ's findings make no distinction between one- and two-person jogging when evaluating each element of the Secretary's prima facie case. As a result, at first blush the ALJ's findings appear to flow logically from the evidence. However, close examination shows that, because of the lack of distinction and factfinding regarding one- versus two-person jogging, there is not substantial evidence regarding the Secretary's prima facie case during single-person jogging.

Fourth, any violation of the LOTO standards during two-person jogging was due to unforeseeable employee misconduct, and the ALJ ignored substantial evidence in the record supporting Petitioner's defense.

Finally, there is substantial evidence that Petitioner trained its employees on LOTO, that the LOTO standard did not apply, and the ALJ erred in determining that Petitioner's affected employees were authorized employees.

## IX. <u>ARGUMENT</u>

The Sixth Circuit will uphold the Commission's legal conclusions "unless they are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Cleveland Constr., Inc. v. Occupational Safety & Health Rev. Comm'n*, 201 F.3d 440, 1999 WL 1253100, at *2 (6th Cir. 1999) (citing 5 U.S.C. § 706(2) (1994) (quotations omitted)). The Commission's factual determinations will be affirmed if they are supported by "substantial evidence." *Id.* Substantial evidence is "such relevant evidence as a reasonable mind could accept as adequate to support the conclusion reached." *Id.* (citation, alternation, and punctuation omitted).

To prove an employer violated an OSHA standard before the Commission, OSHA must show by a preponderance of the evidence that "(1) the cited standard applies; (2) the employer failed to comply with the terms of the cited standard; (3) employees had access to the violative condition; and (4) the cited employer either knew or could have known with the exercise of reasonable diligence of the violative

condition." *JPC Group, Inc.,* 22 BL OSHC 1859, 2009 WL 2567337, at *2 (No. 05-1907, 2009).

## A. **Citation 1 Item 3**

The cited standard for Citation 1 Item 3, 29 C.F.R. § 1910.147(c)(4)(i) states: "Procedures shall be developed, documented and utilized for the control of potentially hazardous energy when employees are engaged in the activities covered by this section." 29 C.F.R. § 1910.147 is known as the LOTO standard. *See, e.g.,* *Dayton Tire*, 23 BL OSHC 1247, 2010 WL 3701876, at *3 (No. 94-1374, 2010) *overruled in part on other grounds by Dayton Tire v. Sec'y of Lab.*, 671 F.3d 1249, 1256 (D.C. Cir. 2012) (citations, punctuation, and alteration omitted). "In general, the LOTO standard requires an employer to establish a program that includes employee training, use of energy control procedures, and periodic inspections designed to prevent employee exposure to the *unexpected* energization of equipment during servicing and maintenance operations." *Id.* (emphasis added) (citations, punctuation, and alteration omitted).

The LOTO standard "covers the servicing and maintenance of machines and equipment in which the *unexpected* energization or start up of the machines or equipment, or release of stored energy could cause injury to employees." *Id.* at *4 (emphasis in original). "Servicing and/or maintenance is defined as workplace activities such as constructing, installing, setting up, adjusting, inspecting,

modifying, and maintaining and/or servicing machines or equipment, including lubrication, cleaning or unjamming of machines or equipment and making adjustments or tool changes, where the employee may be exposed to the *unexpected* energization or startup of the equipment or release of hazardous energy. *Dayton Tire*, 2010 WL 3701876, at *4 (same). "Although the phrase '*unexpected* energization' is not defined in the standard, the Commission has held that energization is 'unexpected' in the absence of some mechanism to provide adequate advance notice of machine activation." *Id.* (same).

### i. The ALJ Erred in Finding That Unjamming Was a Pre-Production Activity and Not Integral to Production.

Petitioner met its burden to show that the minor service exception to Section 1910.147 applies to the activities described in Citation 1 Item 3, and the ALJ erred in finding that unjamming was not integral to the use of equipment for production and erred in finding that unjamming was a pre-production activity. Under the LOTO standard:

> [S]ervicing or maintenance that takes place 'during normal production operations' is covered by the standard only if (1) '[a]n employee is required to remove or bypass a guard or other safety device,' or (2) '[a]n employee is required to place any part of his or her body into an area on a machine or piece of equipment where work is actually performed upon the material being processed . . . or where an associated danger zone exists during a machine operating cycle.'

*Id.* (quoting 29 C.F.R. § 1910.147(a)(2)(ii)). Additionally, an exception to this particular provision, known as the 'minor servicing exception,' states that:

> 'Minor tool changes and adjustments, and other minor servicing activities, which take place during normal production operations, are not covered by this standard if they are routine, repetitive, and integral to the use of the equipment for production, provided that the work is performed using alternative measures which provide effective protection (See subpart O of this part).'

*Id.* (quoting 29 C.F.R. § 1910.147(a)(2)(ii) (note)). Minor service activities have been defined by Commission caselaw as activities that "are (1) performed routinely and repetitively during normal production operations, (2) integral to the use of the equipment for production, and (3) performed using other safety measures which provide effective protection." *Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am., UAW v. Occupational Safety & Health Admin.*, 938 F.2d 1310, 1323 n.10 (D.C. Cir. Sept. 16, 1991). "Examples are lubricating, cleaning, unjamming and making minor adjustments and tool changes." *Id*; *see Westvaco Corp.*, 16 BL OSHC 1374, 1993 WL 369040, at *3 (No. 90-1341, 1993) ("[T]he lockout/tagout standard excepts from coverage . . . minor servicing during normal production operations so long as the employee is adequately protected from the hazard by effective alternative means. . . . [T]he types of minor servicing excepted are routine, repetitive, and integral to the use of the equipment for production."); *Matsu Alabama, Inc.*, 25 BL OSHC 1952, 2015 WL 6941348, at *7 (No. 13-1713, 2015) (ALJ) (An employer "must show that the adjustments are minor *and* made

14

during *normal production operations*, and that effective alternative protection is provided." (emphasis in original) (citing *Westvaco Corp.*); *see also The Control of Hazardous Energy-Enforcement Policy and Inspection Procedures*, Directive No. CPL 02-00-147, ch. 3, sec. IV, pp. 3-25-3-32, R-23 (Feb. 11, 2008).

Here, the Commission ALJ erred as a matter of law when finding that, while Petitioner's unjamming of the R88 Rewinder "may be 'routine' and 'repetitive,' they are not 'integral to the use of the equipment for production' but rather occur pre-production." (A-001). Moreover, the ALJ erred in finding that "[w]hen the R88 Rewinder jams, the machine shuts down and no longer performs its intended function of producing toilet paper." (A-001). There is also not substantial evidence in the record to support these findings. In support, the ALJ cited *Westvaco Corp.*. However, the ALJ misapplied *Westvaco Corp.*, as that case did not find that the servicing in that case was minor and held only that the activities done by that employer during set-up were not performed during production because they were done prior to the start of production. *See Westvaco Corp.*, 1993 WL 369040, at *5 ("The judge found that the helper's adjustments of the shaft heads to accommodate each customer's specifications in anticipation of the next production run is "setting up," or, as defined in the standard, 'work performed to prepare a machine or equipment to perform its normal production operation.' We agree.").

This case, however, is not like *Westvaco* because, unlike the employer in *Westvaco* or even the employer in *Matsu Alabama, Inc.*, Petitioner does not do a number of adjustments and various repairs under the minor service exception to the R88 Rewinder. Instead, this case is about unjamming material or paper wrap-ups, *not repairs and adjustments*, and the evidence is clear that Petitioner's maintenance department is fully LOTO trained and that unjamming and wrap-ups are done by operators, not maintenance. Moreover, Petitioner is not setting up the machine for a production run when its operators clear a paper jam, unlike the employer in *Westvaco* that was engaging in set-up activities. Instead, jams happen during a production run, and unjamming is conducted *to continue its current production run*.

And while the Secretary makes much of the time it takes to rethread paper when that is necessary, the ALJ did not find that unjamming in this case was not a minor activity, (A-001), and there is no Commission case holding that length of time is dispositive for this issue or that tasks must not take more than a few minutes to be considered "minor." Instead, when evaluating whether Petitioner's unjamming of paper and other material is done during production and if it is integral to production (as opposed to being done during set up), "the nature of the work is important to consider," and whether "the work is done prior to production runs is critical in determining if the adjustments are made during normal production operations." *Westvaco Corp.*, 1993 WL 369040, at *5. As the Commission has noted, "'The plain

meaning of the word 'prepare' as it is used to define 'setting up' in section 1910.147(b) includes the idea of activity before some event. One dictionary defines 'prepare' as 'to make ready beforehand for some purpose.' Webster's Third New International Dictionary 1790 (1986 unabridged)." *Westvaco Corp.*, 1993 WL 369040, at *5. Here, Petitioner's unjamming of material is clearly not preparing machinery to run but rather a task to remove material that stopped its machinery from running, and unjamming allows Petitioner's machinery to continue its production run. There is no evidence that unjamming is done prior to production runs or to set up Petitioner's machinery, and there is no caselaw supporting a finding that the stoppage of machinery to unjam that machinery per se removes that activity from normal production activities.

Moreover, the Secretary has issued guidance that the "minor servicing" exception "generally contemplates servicing or maintenance that does not require significant disassembly of machines or equipment and may apply to, for example, changing label and ribbon stock, [and] clearing paper jams . . . ." *Clarification on the USPS's lockout/tagout procedures and minor servicing operations for the multiple line optical character recognition sorter*, OSHA https://www.osha.gov/laws-regs/standardinterpretations/2003-06-11 (last visited April 3, 2025). OSHA has also noted in guidance that the preamble to the LOTO rule has discussed OSHA's rationale for allowing the minor service exception and

that the exception exists only because full LOTO procedures during minor servicing and maintenance that was routine and repetitive during production "'would prevent the machine from economically being used in production.' 54 FR 36644, 36662 (September 1, 1989)." *Printing Industry: Lock Out/Tag Out and the essential elements of the inch-safe-service technique*, OSHA, https://www.osha.gov/laws-regs/standardinterpretations/2004-04-07 (last visited April 3, 2025). After the Supreme Court's ruling in *Loper Bright Enters. v. Raimondo*, *Chevron* deference to agency statutory interpretation has fallen. *Tennessee v. Becerra*, 131 F.4th 350, 365 (6th Cir. 2025) (*citing* 603 U.S. 369, 144 S. Ct. 2244, 2266 (2024)). Sixth Circuit courts "will not simply 'rubberstamp' an administrative decision that is 'inconsistent with a statutory mandate or that frustrate[s] the congressional policy underlying a statute.'" *Nat'l Lab. Rels. Bd. v. Macomb*, No. 23-1335, 2024 WL 4240545, at *3 (6th Cir. Sept. 19, 2024) (citation omitted); *In re MCP No. 185*, 124 F.4th 993, 997 (6th Cir. 2025) ("[The Court] no longer afford[s] deference to the [Federal Communications Commission's] reading of the statute . . . Instead, [the Court's] task is to determine 'the best reading of the statute' in the first instance[,] [u]sing 'the traditional tools of statutory construction'") (citations omitted).

Here, OSHA's interpretation of the minor service exception in such a narrow manner as to preclude the removal of jams because of a lack of employer efficiency deserves little deference, if any, and the ALJ erred as a matter of law in finding that

unjamming was not done during production and not integral to production. Moreover, the evidence in this matter shows that, even with the minor service exception, Petitioner's efficiency is a matter of concern for it, and fully shutting down the R88 Rewinder so employees can clear paper jams is exactly the result that the minor service exception was created to avoid. Thus, there was substantial evidence that Petitioner has met its burden to show that the minor service exception applies to activities cited in Citation 1 Item 3 in this matter, especially that such activities occurred during production and were integral to the use of the R88 Rewinder for production.[1] Accordingly, the Commission ALJ erred in finding that not applying LOTO during one-person unjamming constitutes the violative condition for Citation 1 Item 3.

### ii. There Is Substantial Evidence That Petitioner Meets the Other Elements of the Minor Service Exception During One-Person Jogging.

Substantial evidence shows that re-threading and unjamming of paper and other materials meets the other factors for the minor service exception to 1910.147's applicability. *See Quebecor World - Salem Div., & Its Successors*, 19 BL OSHC

---

[1] The testimony elicited from the Secretary suggested that <u>any</u> servicing and maintenance performed is, by definition, not within normal production. This position is foreclosed by the plain reading of 29 CFR 1910.147(a)(2), which clearly contemplates servicing and maintenance during production: "Servicing and/or maintenance which takes place during normal production operations is covered by this standard only if . . . ," and "Minor tool changes and adjustments, and other minor servicing activities, which take place during normal production operations, are not covered by this standard if . . . ." The regulation clearly contemplate service and maintenance activities during production, and to the extent the Secretary argues that <u>any</u> servicing precludes production and thus removes <u>any</u> potential to utilize the minor service exception, there is no caselaw supporting this position.

1627, 2001 WL 1083763, at *4 (No. 01-0031, 2001) (ALJ) ("The record shows that changing rolls of film wrap, and rethreading film into the wrapper rollers are routine adjustments, which the wrapper operator must perform during normal production to ensure the proper operation of the machine. Such adjustments involve no tools, and take up only moments of the operator's time. They clearly constitute "minor" servicing. The evidence also establishes that the multiple photo-electric eyes in the wrapper cage provide effective alternative protection by detecting the presence of the operator in the cage, and preventing the startup of the wrapper."). OSHA's directive on LOTO even provides that:

> In the printing industry, . . . the following . . . minor servicing activities [are] commonly performed during normal production operations: 1. Clearing of *certain* types of paper jams; 2. Minor cleaning, lubricating, and adjusting operations; 3. Certain plate and blanket changing tasks; and 4. In some cases, paper webbing and paper roll changing.

*The Control of Hazardous Energy-Enforcement Policy and Inspection Procedures*, Directive No. CPL 02-00-147 (Feb. 11, 2008) (emphasis in original).

Here, substantial evidence shows, and the CSHO admitted at the hearing, that the R88 Rewinder is similar in operation to a printing press. (A-156 [Tr. 389:14-390:11]). Moreover, substantial evidence in this case shows that Petitioner's re-threading and jam removal were done frequently, that paper tears, wrap-ups, or jams happened for a myriad of reasons during a production run, that the procedure of re-threading or unjamming was minor in that it only required the removal of material,

paper, and threading paper, that re-threading or unjamming is required for normally production to occur, that such activities occur during a protection run, and that one employee could perform these tasks without assistance. Thus, Petitioner has shown that unjamming and rethreading are minor, integral to production, done during production, and repetitive.

Moreover, Petitioner's employees used an interlocked door to control access to the area where paper threading and unjamming occurred. Regarding effective alternative protection required by Subpart O, the Commission has held that "[t]o determine adequacy, and therefore compliance, we consider whether, given the manner in which the machine functions and how it is operated by the employees, they are exposed to a hazard. In other words, for the Secretary to establish the exposure *to a hazard* required for noncompliance, he "must show that it is reasonably predictable either *by operational necessity or otherwise (including inadvertence)*, that employees have been, are, or will be in the zone of danger." *Aerospace Testing All.*, 2020 CCH OSHD ¶ 33807, 2020 WL 5815499, at *3 (No. 16-1167, 2020) (citation omitted) (emphasis in original).

Here, substantial evidence shows that Petitioner's use of the interlock door provided that alternative protection, and the ALJ made no finding to the contrary. Additionally, before jogging can occur, an audible alarm sounds three times, there is a delay, and then the machine can be jogged while holding the button down, and

if an employee releases the jog button, the jogging stops. Given the solitary nature of the task, this interlocked door was sufficient protection as it deenergized all relevant hazardous machinery inside the machine. Given that two-person jogging was prohibited, and that the unjamming or jogging task was a one-person task, there was no exposure to hazards inside the machine from operational necessity during unjamming, re-threading, or wrap-ups. Moreover, given that Perkins and Hill performed a prohibited two-person jog, Perkins's actions were intentional, and the Act does not require Petitioner to guard against an intentional act.[2] Thus, Petitioner met the requirements for the minor service exception. Therefore, 1910.147 does not apply, and Citation 1 Item 3 should be vacated.

### iii. There Is Not Substantial Evidence That the Cited Standard Applies During One-Person Jogging Or Two-Person Jogging.

Alternatively, the Secretary failed to meet its burden to show exposure to a hazard to which LOTO applies, and the ALJ erred in ignoring substantial evidence that the LOTO standard does not apply during one-person jogging. This is because there is no exposure to the unexpected reenergization of the R88 Rewinder during one-person jogging. Specifically, the Secretary bears the burden to show that "there is some way in which the particular machine could energize, start up, or release

---

[2] To the extent the Secretary argues that the distance between jog buttons negates the alternate protective measures in place, there is no evidence in the record of employees hitting the incorrect buttons or that Petitioner knew of this occurring or being possible. This, therefore, cannot be the basis of affirming Citation 1 Item 3.

stored energy without sufficient advance warning to the employee." *Gen. Motors Corp.*, 17 BL OSHC 1217, 1995 WL 247469, at *4 (No. 91-2973, 1995); *accord Reich v. Gen. Motors Corp.*, 89 F.3d 313, 315 (6th Cir. 1996) (concluding "that the plain language of the lockout standard unambiguously renders the rule inapplicable where an employee is alerted or warned that the machine being serviced is about to activate"). The LOTO "standard clearly and unambiguously applies only where the Secretary shows that unexpected energizing, start-up or release of stored energy could occur and cause injury." *Gen. Motors Corp.*, 1995 WL 247469, at *2.

The facts in this case are very similar to *Quebecor World*. In *Quebecor World*, the ALJ found that "[t]he evidence establishes that the wrapper could only be reactivated by a second employee deliberately taking the machine out of its 'manual' mode and restarting it. No one could complete the multi-step start up procedure, without closing the cage's gate, located only a few feet from the operator servicing the wrapper. The closing of the gate, the start of the pneumatics, and the audible alarm would, of necessity, alert the operator to the wrapper's impending start-up." 2001 WL 1083763 at *4. The ALJ went on to find that "[b]ecause the operator would inevitably become aware of this activity, the machine's startup would not be unexpected" and therefore the citation was vacated. *Id.*

Here, first, there is substantial evidence showing no exposure to the unexpected reenergization of the R88 Rewinder during one-person jogging. The ALJ

focused on the actual knowledge of Petitioner's supervisors that the R88 Rewinder was not LOTO when *one* operator goes inside to jog and unjam the R88 Rewinder. Therefore, it is not exposure to unexpected energization during two-person jogging but instead merely not applying LOTO during any unjamming that is the violative condition for Citation 1 Item 3, (A-001). Given that one person performing the jogging function at the control panel, whether forward or reverse, cannot access a zone of danger, and given that forward jogging with a pendant is intentionally jogging the machine, there can be no unexpected energization while one-person jogging and unjamming the R88 Rewinder. The ALJ erred in concluding otherwise, and there is not substantial evidence to support that one employee performing a one-person jog is or ever was exposed to a hazard or unexpected energization that could cause injury. There simply is no unexpected energization during one-person jogging. Therefore, the LOTO standard cited does not apply, and Citation 1 Item 3 should be vacated.

Alternatively, second, *even when a second employee improperly inserts themselves into the process of jogging*, rethreading and unjamming inside the interlocked door, given the alarm that sounds upon a reset, the delay in operation upon initiating a reset, the deadman switch, the space at issue if two persons were inside the machine, the distance between the control panel and a zone of danger, and the lack of evidence that Perkins could have reverse jogged the R88 Rewinder

without Hill's knowledge, the LOTO standard does not apply to the activity being done on the R88 Rewinder.

### iv. There Is Not Substantial Evidence That Petitioner Had Knowledge of a Violation.

There was also not substantial evidence that Petitioner knew or should have known of the violative condition. The Secretary bears the burden of proving each element required to establish a violation of an OSH Act regulation including, in the case of serious violations, employer knowledge. *W.G. Yates and Sons Constr. Co. Inc. v. Occupational Safety & Health Rev. Comm'n*, 459 F.3d 604, 607 (5th Cir. 2006). The Act "imposes liability on the employer *only* if the employer knew, or 'with the exercise of reasonable diligence, [should have known] of the presence of the violation.'" *Id.*

### 1. Petitioner Had No Actual Knowledge.

The ALJ erred by finding that, because Petitioner's worksite superintendent, Jacob Giammarino, knew that jogging occurred during unjamming and that reserve jogging was possible, Petitioner had actual knowledge of violation of the LOTO standard. (A-001). Here, however, regarding actual knowledge of reverse jogging, substantial evidence in the record shows only that (1) reverse jogging can only be done at the panel; (2) reverse jogging cannot be done via the deadman switch; (3) because of distance, an employee does not have access to any zone of danger while that same employee is hitting the reverse jogging button on the control panel; (4)

employees expect the machine to jog in reverse immediately upon hitting the reverse job button; and (5) reverse jogging is rarely used. It is not enough to show that jogging occurred to affirm the citation item. The Secretary had to show unexpected energization that caused injury and that Petitioner knew of this exposure to the unexpected energization. As noted above, however, there is no unexpected energization that could cause injury to an employee when that one employee reverse jogs.

Additionally, regarding two-person jogging, the Commission's finding as to knowledge of Citation 1 Item 3 rests solely on the knowledge of superintendent Giammarino, and the Commission ALJ made no finding as to the significance of the fact that superintendent Giammarino knew that jogging occurred during unjamming. Simply put, there is not substantial evidence showing that superintendent Giammarino actually knew two-person jogging of any kind occurred at the time of the accident.

Therefore, because (1) there is no evidence of exposure to injury from unexpected energization during reverse, one person jogging that is required for LOTO to apply or be violated; (2) the Secretary does not argue that one-person regular jogging presents a violation, and there is no evidence to support such a finding; (3) there is no evidence that superintendent Giammarino knew that two-

person jogging occurred, the Commission's finding of actual knowledge against Petitioner for Citation 1 Item 3 lacks substantial evidence and must be vacated.

Alternatively, and the ALJ did not rest the decision on this, the only evidence of actual knowledge of regular, two-person jogging (not reverse, two-person jogging, of which there is no evidence) comes from ex-employee Hill, who was fired for two-person jogging. Hill indicated that his supervisor, Bixler, knew of two-person jogging and performed that with Hill. Bixler explicitly denied this, and the Secretary did not elicit any other evidence of two-person jogging occurring within six months of the issuance of the citation, much less that any supervisor knew about it. Instead, substantial evidence shows only that the only *unexpected* energization that can occur is during a prohibited task—two-person jogging. There is not substantial evidence in the record that any supervisor knew that two-person jogging was occurring at the time of the accident, *much less that reverse, two-person jogging was occurring.* And there is no evidence that Petitioner knew unexpected energization *even could occur* during one-person reverse jogging. Therefore, even if Hill's testimony was found to be credible by the Commission, because the Secretary failed to introduce more evidence of when or how violations occurred, it still does not represent substantial evidence of a violation for which Petitioner could have been cited due to the six months' statute of limitations in the OSH Act. 29 U.S.C.§ 658 ("No citation may be issued under this section after the expiration of six months

following the occurrence of any violation."). Therefore, Citation 1 Item 3 should be vacated.

## 2. Petitioner Had No Constructive Knowledge.

Alternatively, there is not substantial evidence showing constructive knowledge of a hazard during jogging of any kind. Lacking evidence of actual knowledge, the Secretary was required to show constructive knowledge. "To prove constructive knowledge, the Secretary must show that the employer, with the exercise of reasonable diligence, could have known of the hazardous condition." *Shaw Areva Mox Servs., LLC*, 23 BL OSHC 1821, 2012 WL 525155, at *4 (No. 09-1284, 2012). "Whether an employer was reasonably diligent involves consideration of several factors, including an employer's obligation to inspect the work area, anticipate hazards to which employees may be exposed, and take measures to prevent the occurrence of violations." *Id.*

Here, the Secretary put on little evidence of Petitioner's policies, except to introduce evidence that Petitioner has them, that Petitioner trains its employees on those policies, at least one supervisor conducts workplace audits, and the Company disciplines its employees for violations, particularly of the two-person jogging rule. The dearth of evidence from the Secretary regarding the frequency of Petitioner's supervisors having observed two-person jogging, much less reverse two-person jogging, or when those observations would have occurred, shows that there is not

substantial evidence regarding employer knowledge for Citation 1 Item 3, and that item must be vacated.

### v. Any Violation of 29 CFR 1910.147(c)(4)(i) Is the Result of Employee Misconduct, Particularly While Performing a Prohibited Two-Person Jog.

The ALJ erred in finding that *none* of the elements of Petitioner's employment misconduct defense were met. (A-001). That is why Petitioner focuses on exposure during one-person jogging: the ALJ's rejection of Petitioner's employee misconduct defenses rests on a mistaken blurring of the factual distinctions between one- and two-person jogging, and there is a lack of substantial evidence regarding exposure to unexpected energization for *one-person jogging*. As noted above, there is not substantial evidence to support a violation regarding one-person jogging. But Citation 1 Item 3 must also be vacated if the violative condition rests instead upon two-person jogging, because it constituted employee misconduct. The ALJ made the following findings, and no more, regarding Petitioner's employee misconduct defense:

> None of the elements required for a showing of unpreventable employee misconduct were established in this case. Employees who performed unjamming activities on the R88 Rewinder according to Appellant's prescribed procedures, regardless of Appellant's two-person jog rule, violated the LOTO standard in the manner alleged in the citation. Appellant's operators were exposed to hazardous energy whether they engaged in one or two-person jogging. (Tr. 122, 236, 242, 338-39, 348-49; Exs. J-2 at 5, J-4). Thus, Appellant did not have "a work rule that effectively implemented the requirements of the standard." *TNT Crane & Rigging, Inc.*, No. 16-1587 (OSHRC June 2,

2022) *citing Capform, Inc.*, 16 BNA OSHC 2040, 2043 (No. 91-1613, 1994). Appellant's unpreventable employee misconduct affirmative defense fails.

(A-001). On the contrary, substantial evidence shows that any violation of the cited standard is the results of employee misconduct. "In the Sixth Circuit, in order to successfully assert [an affirmative] defense of [unpreventable employee misconduct], an employer must show that it has a thorough safety program, it has communicated and fully enforced the program, the conduct of the employee was unforeseeable, and the safety program was effective in theory and practice." *Danis-Shook Joint Venture XXV v. Sec'y of Lab.*, 319 F.3d 805, 812 (6th Cir. 2003). "[T]o be effective, the safety program must be designed such that, if followed, it would prevent the violations at issue." *Id.*

Here, substantial evidence shows that Petitioner (1) had a safety program and trained its employees; (2) prohibited two-person jogging and trained its employees on that exact prohibition; (3) inspected the worksite for violations of its safety rules, including the prohibited two-person jogging; (4) did not observe two-person jogging near the time of the accident and was taking steps to continue to eliminate the practice; and (5) had disciplined several employees—including terminations of employment—for violations of the two-person jogging rule. Petitioner, therefore, met its burden to show employee misconduct by Perkins and Hill at the time of the accident, and thus the ALJ erred in finding otherwise.

## B. <u>Citation 1 Item 4</u>

The cited standard for Citation 1 Item 4, 29 C.F.R. § 1910.147(c)(7)(i)(A), states, "Each authorized employee shall receive training in the recognition of applicable hazardous energy sources, the type and magnitude of the energy available in the workplace, and the methods and means necessary for energy isolation and control."

### i.     The LOTO Standard Does Not Apply.

There is not substantial evidence showing a violation of the cited standard because, as discussed above, LOTO did not apply to the activity for which the Secretary claims authorized LOTO training was needed. That is, Petitioner was not required to train its operators as authorized employees because, the LOTO standard does not apply or because the operator's activities fell under the minor service exception. The ALJ's decision rests upon the fact that, because the ALJ held that LOTO applied, the employees were authorized employees. Therefore, the logic goes, Petitioner must train its employees as authorized employees. While there is no dispute that Petitioner did not train Hill and Perkins as authorized employees, if Petitioner prevails on Citation 1 Item 3, then there is not substantial evidence to support a violation of Citation 1 Item 4. Substantial evidence shows that Petitioner considered its operators affected employees and trained them as affected for LOTO purposes; Petitioner trained the employees it considered authorized employees

pursuant to the LOTO standard. Moreover, any activity that should have been performed by authorized employees was the result of employee misconduct. Therefore, Thus, Citation 1 Item 4 should be vacated.

### ii. The Secretary Has Not Met Her Burden for Citation 1 Item 4.

Alternatively, substantial evidence shows that Petitioner complied with the standard cited, and there is not substantial evidence to the contrary. The only evidence of a LOTO training violation for Citation 1 Item 4 related to training is that OSHA considers Petitioner operators of the R88 Rewinder to be authorized employees, and Petitioner produced no documentation that its operators were trained as authorized employees. Petitioner considered its operators affected employees and trained them as affected for LOTO purposes. Petitioner trained the employees it considered authorized employees pursuant to the LOTO standard. Moreover, employee misconduct cannot convert Petitioner's affected employees into authorized employees, and there is not substantial evidence to support a violation of the cited standard.

## X. <u>CONCLUSION</u>

WHEREFORE, Petitioner respectfully requests that the Commission's Decision and Order be reversed regarding its finding that Petitioner violated 29 C.F.R. § 1910.147(c)(4)(i) and 29 C.F.R. § 1910.147(c)(7)(i)(A) and that Citation 1 Item 3 and Citation 1 Item 4 against Petitioner be vacated.

Respectfully submitted,

FISHER & PHILLIPS LLP

By:    */s/ J. Micah Dickie*
       J. Micah Dickie (GA 324015)
       FISHER & PHILLIPS LLP
       1230 Peachtree St NE, Ste 3300
       Atlanta, Georgia 30309
       Telephone: 404-260-3419
       Facsimile: 404-240-4249
       Email: mdickie@fisherphillips.com

       William E. Curphey (FL 0386741)
       CURPHEY & DERSCH, PA
       816 137th St NE
       Bradenton, FL 34212-2753
       Telephone: 727-599-4785
       Email: billcurphey@gmail.com

       *Counsel for Petitioner Sofidel America*

**XI.** **CERTIFICATE OF COMPLIANCE**

1.     This brief complies with the type-volume of limitation of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure because it contains 7,404 words as counted by Microsoft Word, excluding the sections of the brief exempted by Rule 32(f) of the Federal Rules of Appellate Procedure and Sixth Circuit Rule 32(b).

2.     This brief complies with the typeface requirements of Rule 32(a)(5) of the Federal Rules of Appellate Procedure and the type-style requirements of Rule 36(a)(6) of the Federal Rules of Appellate Procedure because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

By:     */s/ J. Micah Dickie*
J. Micah Dickie (GA 324015)


Dated: April 9, 2025.

## XII. **CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing has been sent to the following via electronic mail:

Louise McGauley Betts
betts.louise@dol.gov, OSH-SOL@dol.gov
Heather R. Phillips
phillips.heather@dol.gov
Joseph J. Quick
quick.joseph.j@dol.gov
US Department of Labor
Office of the Solicitor
200 Constitution Ave NW Ste 4004
Washington, DC 20210

John X. Cerveny
jcerveny@oshrc.gov
OSHRC
1120 20th St NW Ste 980
Washington, DC 20036-3419

This the 9th day of April, 2025.

*/s/ J. Micah Dickie*
J. Micah Dickie (GA 324015)