IN THE UNITED STATES COURT OF APPEALS
FOR THE SIXTHCIRCUIT

_____

**SOFIDEL AMERICA,**

Petitioner,

v.

**LORI CHAVEZ-DeREMER, SECRETARY OF LABOR,**

Respondent.

_____

On Petition for Review of the Final Order of the
Occupational Safety and Health Review Commission
No. 23-0494

_____

**BRIEF FOR THE SECRETARY OF LABOR**
_____

JONATHAN L. SNARE
Acting Solicitor of Labor

EDMUND C. BAIRD
Associate Solicitor of Labor for
Occupational Safety and Health

LOUISE McGAULEY BETTS
Counsel for Appellate Litigation

JOSEPH QUICK
Attorney
U.S. Department of Labor
200 Constitution Ave., NW, Suite S-4004
Washington, DC  20210
(202) 693-5703
quick.joseph.j@dol.gov

May 9, 2025

# TABLE OF CONTENTS

TABLE OF CONTENTS   ..........................................................................ii

TABLE OF AUTHORITIES .....................................................................iv

STATEMENT REGARDING ORAL ARGUMENT ...............................viii

STATEMENT OF JURISDICTION.........................................................1

STATEMENT OF THE ISSUES...............................................................2

STATEMENT OF THE CASE ..................................................................4

I. Procedural History..................................................................4

II.   Statutory and Regulatory Background ............................5

III.   Statement of Facts ...........................................................8

    A. R88 Line Gambini Rewinder Machine and the "Jogging"
        Process. ........................................................................8

    B. A Sofidel Employee Is Severely Injured While Clearing Jammed
        Material from the Rewinder. ......................................11

    C. Sofidel's Employee Classifications, Training, and Policies.......13

    D. OSHA Inspects the Worksite and Issues Sofidel Citations for
        Serious Violations of the Lockout/Tagout Standard. ................16

    E. The ALJ's Decision.....................................................19

SUMMARY OF THE ARGUMENT .........................................................21

ARGUMENT ............................................................................................24

I. Standard of Review..............................................................24

II.    The ALJ Correctly Concluded that Sofidel Violated 29 C.F.R. § 1910.147(c)(4)(i) Because the LOTO Standard Applies to Unjamming the Rewinder Without Any Exceptions and Sofidel Had Knowledge of the Hazardous Conditions. .................................................. 24

    A. The ALJ Properly Determined that 29 C.F.R. § 1910.147(c)(4)(i) Applied to Unjamming the Rewinder Because the Unjamming Activities Were Servicing and/or Maintenance Under the Standard and Employees Were Exposed to Potential Harm from Unexpected Energization of the Machine. ................................. 26

    B. Substantial Evidence Supports the ALJ's Conclusion that Sofidel Failed to Establish the Minor Servicing Exception. ...... 29

    C. Sofidel Had Knowledge of the Hazardous Conditions Because Multiple Managers Knew Operators Did Not Utilize LOTO Procedures While Unjamming the Rewinder. ........................... 42

III.   Substantial Evidence Supports the ALJ's Conclusion that Sofidel Failed to Prove the Unpreventable Employee Misconduct Defense. 44

IV.    Substantial Evidence Supports the ALJ's Finding that Sofidel Did Not Comply with 29 C.F.R. § 1910.147(c)(7)(i)(A) Because It Did Not Provide Adequate LOTO Training to the Operators Who Unjammed the Rewinder. ....................................................................... 49

CONCLUSION ....................................................................... 52

CERTIFICATE OF COMPLIANCE ......................................... 53

CERTIFICATE OF SERVICE................................................. 54

# TABLE OF AUTHORITIES

| Cases | Page(s) |
|---|---|

*Angel Bros. Enters., Ltd.,*
  2020 WL 4514841 (OSHRC, July 28, 2020)........................................60

*Brock v. L.E. Myers Co., High Voltage Div.,*
  818 F.2d 1270 (6th Cir. 1987)..............................................................63

*Campbell v. BNSF Ry. Co.,*
  600 F.3d 667 (6th Cir.2010).........................................................47, 59

*Crown Cork & Seal Usa, Inc.,*
  23 BNA 1674 OSHC, 2011 WL 1290676 (No. 09-0973, 2011)............50

*Danis -Shook Joint Venture XXV v. Sec'y of Labor,*
  319 F.3d 805 (6th Cir. 2003)..............................................58, 59, 61, 62

*Dayton Tire,*
  23 BNA OSHC 1247, 2010 WL 3701876 (No. 94-1374, 2010)............40

*Dayton Tire,*
  671 F.3d 1249 (D.C. Cir. 2012) ..........................................................41

*Elec., Inc. v. OSHA,*
  221 F.3d 861 (6th Cir. 2000)................................................................32

*Gen. Motors Corp., Cpcg Oklahoma City Plant,*
  22 BNA OSHC 1019, 2007 WL 4350896 (No. 91-2834E, 2007) ....37, 39

*Jacobs Field Servs., N. Am., Respondent,*
  2018 WL 7080228 (OSHRC December 11, 2018) ...............................61

*Johnson Brass & Mach. Foundry, Inc.,*
  2024 WL 5206740 (OSHRC Nov. 15, 2024)..............................37, 38

iv

*Kisor v. Wilkie,*
139 S.Ct. 2400 (2019)……………………………………………………40

*Sec'y of Labor v. Precast Servs., Inc.,*
17 BNA OSHC, 1995 WL 693954 (No. 19-2971, 1995)……………..…48

*Loper Bright Enters. v. Raimondo,*
603 U.S. 369 (2024)……………………………………………………....39

*Martin v. OSHRC,*
499 U.S. 144 (1991)……………………………………………………...40

*Matsu Alabama, Inc. v. Occupational Safety & Health Rev. Comm'n,*
670 F. App'x 699 (Mem) ………………………………………………44

*Matsu Alabama, Inc.,*
25 BNA OSHC 1952, 2015 WL 6941348 (No. 13-1713, 2015)…….43, 44

*Mountain State Contractors, LLC v. Perez,*
825 F.3d 274 (6th Cir. 2016)…………………………………31, 33, 56, 57

*Otis Elevator Co.,*
24 BNA OSHC 1081, 2013 WL 3998034 (No. 09-01278, 2013)…..36, 38

*Otis Elevator Co.,*
762 F.3d 116 (D.C. Cir. 2014) …………………………………………36

*Quebecor World – Salem Division,*
19 BNA OSHC 1627, 2001 WL 1083763
(No. 01-0031, 2021)……………………………………………49, 50, 51, 52

*Revoli Constr. Co., Inc.,*
19 BNA OSHRC 1682, 2001 WL 1568807 (No. 00-0315, 2001)…………59

*Reynolds Packaging Kama, Inc.,*
22 BNA OSHC 1952, 2009 WL 3361403 (No. 08-1554, 2009)…….47, 48

*Spirit Aerosystems, Inc.*,
   25 BNA OSHC 1093, 2014 WL 7434582 (No. 10-1697, 2014)....... 33, 34

*Tampa Shipyards, Inc.*,
   15 BNA OSHC 1533, 1992 WL 52938 (Nos.86–360, 86–469, 1992) ... 57

*TNT Crane & Rigging, Inc.*,
   2022 WL 2102910 (OSHRC June 2, 2022)......................................... 27

*Valdak Corp. v. OSHRC*,
   73 F.3d 1466 (8th Cir. 1996) ................................................................. 61

*Westvaco Corp.*,
   16 BNA OSHC 1374, 1993 WL 369040
   (No. 90-1341 1993).............................................................. 42, 43, 45, 46

*Whirlpool Corp. v. Marshall*,
   445 U.S. 1 (1980) ....................................................................................... 8

## Statutes

5 U.S.C. § 706(2)(A) .................................................................................... 32
29 U.S.C. § 651(b) .......................................................................................... 8
29 U.S.C. § 658 ........................................................................................ 9, 10
29 U.S.C. § 659 ................................................................................................ 1
29 U.S.C. § 659(a), (c) ................................................................................. 10
29 U.S.C. § 660(a) .............................................................................. 1, 2, 31
29 U.S.C. § 660(a)–(b) .................................................................................. 12
29 U.S.C. § 661(j) ............................................................................. 7, 10, 11
29 U.S.C. § 666 ............................................................................................ 10
29 U.S.C. §§ 651–678................................................................................. 1, 8
29 U.S.C. §§ 652–66..................................................................................... 9
29 U.S.C. §§ 659(c), 661(j) ........................................................................ 11

## Regulations

29 C.F.R. § 1910.147..................................................................................... 12
29 C.F.R. § 1910.147(a)(2)(ii) ("Note") .............................................. 42, 64
29 C.F.R. § 1910.147(c)(4)(i)................................................................ passim

29 C.F.R. § 1910.147(c)(7)(i)(A) ...................................................... passim
29 C.F.R. § 2200.90(d) ................................................................. 8, 11
29 C.F.R. § 2200.91(a) ...................................................................... 11
29 C.F.R. § 1910.147(a)(2)(i) ........................................................ 35, 41
29 C.F.R. § 1910.147(a)(2)(ii) ....................................................... 38, 49
29 C.F.R. § 1910.147(a)(2)(ii)(B) ................................................... 13, 47
29 C.F.R. § 1910.147(b) ............................................................... passim
29 C.F.R. § 1910.147(c)(1) ................................................................ 13

## Other Authorities

Assistant Secretary who directs OSHA. Secretary's,
    Order 8-2020, 85 Fed. Reg. 58393 (Sept. 18, 2020) ............................... 9

Control of Hazardous Energy Sources (Lockout/Tagout),
    54 Fed. Reg. 36644 (Sept. 1, 1989) ......................................... 34, 42, 54

*Printing Industry: Lock Out/Tag Out and the essential elements of the
    inch-safe-service technique,*
    OSHA Interpretive Letter, 2004 WL 3320633 (April 7, 2004) ...... 55, 56

The Control of Hazardous Energy – Enforcement Policy and Inspection
    Procedures at 2-16 (CPL 02-00-147, Feb. 11, 2008) .................... 35, 39

## STATEMENT REGARDING ORAL ARGUMENT

The Secretary believes that the briefs in this case constitute a thorough presentation of the facts and legal issues and does not think oral argument would significantly assist the Court in deciding the issues before it.

## STATEMENT OF JURISDICTION

This matter is before the Court on a petition for review of a final order of the Occupational Safety and Health Review Commission (Commission) affirming citations issued to Petitioner Sofidel America (Sofidel) under the Occupational Safety and Health Act of 1970, 29 U.S.C. §§ 651–678 (OSH Act). The Commission had jurisdiction over this proceeding under 29 U.S.C. § 659.

The Commission issued its final decision and order on November 27, 2024. Sofidel filed its petition for review with this Court on January 23, 2025, within the sixty-day period prescribed by the OSH Act. See 29 U.S.C. § 660(a). This Court has jurisdiction over the petition for review under 29 U.S.C. § 660(a).

# STATEMENT OF THE ISSUES

1. Whether the administrative law judge (ALJ) correctly concluded that 29 C.F.R. § 1910.147(c)(4)(i) of the Lockout/Tagout (LOTO) standard applied when Sofidel employees unjammed its R88 Line Gambini Rewinder (Rewinder) where the plain text of the standard applies to unjamming activities.

2. Whether the ALJ properly determined that Sofidel failed to establish the minor servicing exception to the LOTO standard where servicing the Rewinder did not occur during normal production, was not routine, and where the company did not provide employees adequate alternative protection against the unexpected energization of the machine.

3. Whether substantial evidence supports the ALJ's conclusion that Sofidel had knowledge of the violative conditions where multiple company supervisors testified that they knew employees regularly engaged in one- and two-person jogging to unjam the Rewinder without utilizing LOTO procedures.

4. Whether substantial evidence supports the ALJ's determination that Sofidel did not establish the unpreventable employee

misconduct defense where the company (1) failed to provide sufficient evidence that its purported rule banning two-person jogging was a thorough safety program; (2) failed to provide evidence that the safety program was adequately communicated because the exposed employee was not required to review the employee handbook and his trainer, as well as other supervisors, engaged in two-person jogging; (3) failed to present evidence that the employee's conduct was unforeseeable when the record evidence shows the injured employee had been engaging in two-person jogging since he started the job; and (4) failed to present evidence that the safety program was effective in theory or practice where the program did not require operators to utilize LOTO, and two-person jogging was rampant at the worksite and condoned by managers.

5. Whether the ALJ correctly determined that Sofidel violated 29 C.F.R. § 1910.147(c)(7)(i)(A) where the uncontroverted evidence shows that it did not train its operators tasked with unjamming the Rewinder as authorized employees under its LOTO policy.

**STATEMENT OF THE CASE**

## I.    Procedural History

This case arises from an OSHA inspection conducted after a Sofidel employee suffered a degloving injury to his left hand while working on an R88 Line Gambini Rewinder (Rewinder) machine at the company's Circleville, Ohio facility on September 21, 2022. App'x 296-97.[1] Sofidel reported the injury to OSHA, and OSHA conducted an inspection of the workplace on September 29, 2022. App'x 155.

Following the inspection, OSHA issued Sofidel citations alleging seven violations of multiple standards, including Citation 1, Item 3 alleging a serious violation of 29 C.F.R. § 1910.147(c)(4)(i) for failing to utilize LOTO procedures while servicing the Rewinder, and Citation 1, Item 4 alleging a serious violation of 29 C.F.R. § 1910.147(c)(7)(i)(A) for failing to ensure employees servicing the Rewinder received training in

_____

[1] Citations to "App'x" refer to the Appendix filed by Sofidel on April 9, 2025, and use the Appendix's internal pagination out of 468 pages.

the recognition of hazardous energy sources. App'x 8-9. OSHA proposed total penalties of $15,625 each for Citation 1, Items 3 and 4.[2] *Id.*

Sofidel timely contested the citations, and a hearing on the merits was held on January 9, 2024, before ALJ Sharon Calhoun. App'x 9. On October 17, 2024, the ALJ issued a decision and order affirming the remaining three citations. App'x 26. On November 15, 2024, Sofidel filed a petition for discretionary review, which the Commission denied on November 27, 2024. App'x 43, 45. As such, the ALJ's order became the final order of the Commission by operation of law on November 27, 2024. 29 U.S.C. § 661(j); 29 C.F.R. § 2200.90(d); App'x 45. This appeal followed.

## II.  Statutory and Regulatory Background

### A. The Occupational Safety and Health Act of 1970

Congress enacted the Occupational Safety and Health Act of 1970 (OSH Act or Act), 29 U.S.C. §§ 651–678, "to assure so far as possible every working man and woman in the Nation safe and healthful

---

[2] The Secretary withdrew four of the seven citation items. App'x 33. Additionally, Sofidel did not appeal one of three remaining citation items that the ALJ affirmed. App'x 43.

working conditions." 29 U.S.C. § 651(b). The fundamental objective of the OSH Act is to prevent occupational deaths and serious injuries. *Whirlpool Corp. v. Marshall*, 445 U.S. 1, 11 (1980). To achieve that goal, the Act authorizes the Secretary to promulgate and enforce mandatory occupational safety and health standards. 29 U.S.C. §§ 652–66. OSHA[3] enforces the Act by inspecting workplaces and issuing citations when it believes that an employer has violated a standard. 29 U.S.C. § 658. OSHA citations "describe with particularity the nature of the violation," require the employer to abate the violation, and, where appropriate, assess a civil penalty. 29 U.S.C. §§ 658–659, 666. A violation of the Act may be classified as "serious," "other-than-serious," "willful," or "repeated." 29 U.S.C. § 666.

When an employer timely contests a citation or penalty, the Commission must "afford an opportunity for a hearing," and "thereafter issue an order, based on findings of fact, affirming, modifying, or vacating the Secretary's citation or proposed penalty." 29 U.S.C. §

---

[3] The Secretary's responsibilities under the OSH Act have been delegated to an Assistant Secretary who directs OSHA. Secretary's Order 8-2020, 85 Fed. Reg. 58393 (Sept. 18, 2020). The terms "Secretary" and "OSHA" are used interchangeably in this brief.

659(a), (c). Hearings are presided over by a Commission ALJ. 29 U.S.C. § 661(j). A party dissatisfied with the decision of the ALJ may petition the Commission for discretionary review. 29 U.S.C. §§ 659(c), 661(j); 29 C.F.R. § 2200.91(a). If the Commission does not direct review, the ALJ's decision becomes a final order of the Commission by operation of law. 29 U.S.C. § 661(j); 29 C.F.R. § 2200.90(d). Either the Secretary or an aggrieved party may seek judicial review in the appropriate United States Court of Appeals of a Commission final order. 29 U.S.C. § 660(a)–(b).

## B. The Lockout/Tagout (LOTO) Standard

The LOTO standard, 29 C.F.R. § 1910.147, "covers the servicing and maintenance of machines and equipment in which the *unexpected* energization or start up of the machines or equipment, or release of stored energy could cause injury to employees." 1910.147(a)(1)(i) (emphasis in original). The standard requires that employers:

> establish a program consisting of energy control procedures, employee training and periodic inspections to ensure that before any employee performs any servicing or maintenance on a machine or equipment where the unexpected energizing, start up or release of stored energy could occur and cause injury, the machine or equipment shall be isolated from the energy source, and rendered inoperative.

§ 1910.147(c)(1). To that end, the standard provides that "[p]rocedures shall be developed, documented and utilized for the control of potentially hazardous energy when employees are engaged in the activities covered by this section." § 1910.147(c)(4)(i). The standard includes a narrow exception for "minor servicing activities" that "take place during normal production operations" and "are routine, repetitive, and integral to the use of the equipment for production," so long as "the work is performed using alternative measures which provide effective protection."  § 1910.147(a)(2)(ii)(B).

Employees whose duties involve servicing or maintenance covered by the standard (defined as "authorized employees" under § 1910.147(b)), "shall receive training in the recognition of applicable hazardous energy sources, the type and magnitude of the energy available in the workplace, and the methods and means necessary for energy isolation and control."  § 1910.147(c)(7)(i)(A).

## III.  Statement of Facts

### A. R88 Line Gambini Rewinder Machine and the "Jogging" Process.

Sofidel operates a facility in Circleville, Ohio (worksite), where it manufactures paper products such as toilet paper and paper towels.

App'x 296. Sofidel's manufacturing process includes using the R88 Line Gambini Rewinder machine to transform a 10-foot by 10-foot roll of toilet paper into smaller, common-sized rolls. App'x 92., 97, 112, 121. The Rewinder has multiple sections through which the rolls of paper travel to complete the manufacturing process. App'x 92, 106. After the rolls are loaded into the machine by a machine operator, the rolls travel through the "unwinder" section of the Rewinder before feeding through the "rewinder" section of the machine. App'x 92. From the "rewinder" section, the paper is transferred to an accumulator for storage, cut into the requisite width by product, and then sent downstream for packaging. *Id.*

Throughout a typical day, the Rewinder may break down and stop production for various reasons. App'x 98, 151. Among the reasons are paper breaks, wraparounds, and jams. App'x 98, 99, 134, 151, 174, 188, 225-44. Jams can occur approximately once an hour during the production process. App'x 99. When a jam occurs, production ceases because a computerized control system will stop the Rewinder from functioning. App'x 98, 110-11, 112, 152, 204. The interface, or HMI panel, that sits just outside the Rewinder displays the location of the

jam. App'x 204. A machine operator will physically enter the Rewinder through an interlocked door to clear a jam. App'x 94-95, 96, 100, 315.

The Rewinder continues to operate at limited capacity when the interlocked door is open. App'x 95, 130, 173, 204. Although production is stopped, the powered rollers remain energized, and operators can "jog" (or reverse jog) the machine to clear jams. App'x 130, 173. Jogging the machine involves pressing a "jog" button on a control panel inside the Rewinder. App'x 300, 305. Jogging allows the Rewinder's lower and vacuum rollers to move slowly at a creep speed in the same direction the rollers move in during normal production. App'x 107, 108, 300. When the reverse button is pressed, the lower roller moves towards the operator in the opposite direction of normal production. App'x 114, 147.

The jog button utilized by operators is located on a control panel inside the Rewinder. App'x 106, 284-86. 300. The control panel has a jog button, reset button, emergency stop button, blue deceleration button, and key. *Id.* Operators must reset the Rewinder before they can use the jog button. App'x 108. When the jog button is pressed, an alarm sounds three times to notify the operator that the machine's rollers are about to move forward. App'x 108, 265. When the reverse button is pressed, no

alarm sounds, and the machine's lower roller immediately moves. App'x 122, 137.

Operators jog as far as the machine will allow and then roll the paper around into a circular position. App'x 189. This process is repeated until the operator can get the jammed paper out by hand. *Id.* It can take anywhere from a few minutes to eighty minutes to unjam the Rewinder. App'x 98, 100, 103, 225-44. After a jam is cleared, the machine is then reset at the user interface/HMI panel. App'x 204. If an operator cannot clear a jam, they may call a specialist called a "tuner" for assistance. App'x 104. Like operators, tuners do not utilize LOTO procedures when clearing a jam. App'x 105, 135.

## B. A Sofidel Employee Is Severely Injured While Clearing Jammed Material from the Rewinder.

On September 21, 2022, a Sofidel employee, machine operator Christian Hill, was injured while clearing a jam in the Rewinder. App'x 297. Hill was accompanied by another employee, operator assistant Dezmond Perkins, inside the interlocked door of the Rewinder, and the two performed a "two-person" jog to unjam the machine. App'x 117, 137, 297. While Hill's hand was inside the machine on or next to the rollers, Hill told Perkins to "go ahead and start the reverse." App'x 137. Perkins

pressed the reverse button on the control panel, and, to Hill's surprise, the lower roller instantly moved in the reverse direction before Hill could remove his hand. App'x 137, 138. Hill did not expect the machine to start without hearing an audible "beep" or alarm. App'x 137, 144. Hill's hand became caught in a pinch point between the lower roller and a metal guide plate, resulting in a degloving injury to his left hand. App'x 136.

Hill was taken to a local hospital before taking a medical flight to a hospital in Columbus, Ohio, where he underwent emergency surgery. Hill underwent multiple surgeries, receiving at least two skin grafts for his injuries. He returned to work at Sofidel in December of 2022. App'x 139. Perkins was not disciplined for his involvement in the two-person jogging operation that caused Hill's injury, and he left Sofidel before OSHA issued citations to the company. App'x 132. Hill received a written warning from Sofidel two months after he returned to work and after OSHA had issued the citations. App'x 129-30, 323. Hill was

subsequently terminated for engaging in two-person jogging again at a later date.[4] App'x 116-17, 188.

## C. Sofidel's Employee Classifications, Training, and Policies.

Hill began his employment with Sofidel as an operator assistant. App'x 133. At the time of his workplace injury, he was an operator. *Id.* Jacob Giammarino was a superintendent in the converting department, George Stiles was the production manager, and Marco Lombardi was the plant manager. App'x 90, 91, 202. Additionally, Randy Kuhner was the worksite's health and safety manager, Joseph Frazier was the converting supervisor, Adam Bixler was a superintendent, and Boone Sabine was the maintenance manager. App'x 118, 186, 191-92, 200.

---

[4] Sofidel's statement that "Hill's employment with Petitioner was terminated, like at least three others before him, for performing a prohibited two-person jog after he returned to work from his injuries," Pet'r's Br. 4, obfuscates the facts surrounding his termination. First, Hill was terminated after OSHA issued the citations because he performed two-person jogging *again* after recovering from his degloving injury. App'x 116-17, 188. Moreover, the other employees referenced were also terminated after OSHA issued the citations in this case. App'x 116-17. There is no evidence that any employees were terminated for two-person jogging before OSHA issued the citations in this case, even though the practice was widespread.

Sofidel's training of new operators and operator assistants consisted of four or five days of classroom orientation followed by on-the-job training. App'x 133. During this training, Sofidel informed employees on a single PowerPoint slide that two-person jogging was prohibited. App'x 144, 336. Additionally, Sofidel supplied new employees with employee handbooks. App'x 144, 360. Of the fifty-four-page handbook, about five pages were dedicated to safety. App'x 394-97. The handbook mentioned two-person jogging in a single sentence: "Only the person operating the jog button is allowed to work on the machine."[5] App'x 394. Hill testified that Sofidel brushed over the handbook and told him to: "Read [the handbook] on your own if you would like to." App'x 144.

Sofidel assigns new operator assistants to on-the-job training with experienced, non-management operators after orientation. App'x 127, 221-22. Hill was assigned to operator Todd Featheringham for on-the-job training.  App'x 133. Featheringham showed Hill how to perform a

_____

[5] When asked if there was any training on the prohibition of two-person jogging, Supervisor Bixler stated: "It was simple. It's self-explanatory. You don't do two-man jog." App'x 187.

two-person jog, and the pair performed two-person jogs daily during Hill's first six months of employment. App'x 135. Next, Hill began working on a different machine and immediately started performing two-person jogs with his supervisor, Gordon Caldwell. *Id.* Hill said they performed two-person jogs "too many times to count." *Id.* After three months of work on that machine, Hill became the operator of the Rewinder. Hill testified that he had performed two-person jogs on the Rewinder with his new supervisor, Adam Bixler.[6] App'x 139.

Sofidel did not train operators as "authorized employees" under the LOTO standard but merely trained them as "affected employees."[7] App'x 113, 119. Sofidel only trained maintenance employees as

---

[6] Bixler denied this at the hearing. App'x 187.

[7] Under 29 C.F.R. § 1910.147(b), an affected employee is "[a]n employee whose job requires him/her to operate or use a machine or equipment on which servicing or maintenance is being performed under lockout or tagout, or whose job requires him/her to work in an area in which such servicing or maintenance is being performed." An authorized employee is defined as "[a] person who locks out or tags out machines or equipment in order to perform servicing or maintenance on that machine or equipment." § 1910.147(b). "An affected employee becomes an authorized employee when that employee's duties include performing servicing or maintenance covered under this section." *Id.*

authorized employees. App'x 113, 119.  When an operator is clearing a jam in the Rewinder, Sofidel does not require that employee to apply its LOTO procedure for the Rewinder. App'x 111. As an operator, Hill received basic LOTO training for affected employees. App'x 119, 196, 325.

### D. OSHA Inspects the Worksite and Issues Sofidel Citations for Serious Violations of the Lockout/Tagout Standard.

OSHA compliance officer (CO) Lauren Eberts initiated an inspection of the worksite on September 29, 2022. App'x 155. After arriving at the worksite, CO Eberts conducted an opening conference with health and safety manager Randy Kuhner and plant manager Marco Lombardi. *Id.* Kuhner informed Eberts that two-person jogging was a known issue that had been occurring throughout the worksite. App'x 157, 286. Lombardi informed Eberts that similar injuries had occurred at the worksite due to employees engaging in two-person jogging. App'x 157. Nevertheless, Sofidel's records show only a single employee had received a written warning, and none were terminated for

two-person jogging in the two and a half years leading up to Hill's workplace injury.[8] App'x 123, 124, 132, 282, 319.

Following the opening conference, CO Eberts went onto the floor of the worksite and observed Hill's injury area, took photographs and video, and conducted interviews with additional members of management. App'x 155-57. Supervisor Joe Frazier stated in his sworn statement that two-person jogging was common at the worksite until Hill's injury, corroborating Kuhner and Lombardi. App'x 162, 194, 269. Supervisor Adam Bixel also stated in his sworn statement that wrap-ups were normally cleared with two people and that it was beneficial to have a "second person in there to speed it up[] because [you] can only go

_____

[8] Sofidel's claim that it "terminated or disciplined several employees for performing a two-person" jog before to Hill's injury, Pet'r's Br. 7, is not supported by the record.  Rather, the record establishes that these terminations all occurred after OSHA issued the citations (App'x 116-17), and the excerpts Sofidel cites merely provide that Giammarino fired four employees for activities after Hill's injury (*Id.*), including Hill himself (App'x 188). The final excerpt cited by Sofidel confirms the written warning given to the single employee before Hill's injury (App'x 123, 319).

so far with clearing the wrap-up and reaching the switch itself."[9] App'x 162, 263.

As a result of the inspection, OSHA issued Sofidel two citations alleging multiple OSH Act violations. As relevant here, OSHA cited Sofidel for committing serious violations of 29 C.F.R. § 1910.147(c)(4)(i)[10] by failing to utilize LOTO procedures while servicing the Rewinder and 29 C.F.R. § 1910.147(c)(7)(i)(A)[11] for failing to ensure employees servicing the Rewinder received training in the recognition of hazardous energy sources. App'x 13, 21.

_____

[9] Although Bixler subsequently testified that this practice had stopped in 2019, that testimony conflicted with his sworn statement to the CSHO and the sworn statements of Hill, Kuhner, Lombardi, and Frazier that two-person jogging was an ongoing issue. App'x 135, 139, 144, 157, 162-63, 187.

[10] Section 1910.147(c)(4)(i) states in relevant part: "Procedures shall be developed, documented and utilized for the control of potentially hazardous energy when employees are engaged in the activities covered by this section."

[11] Section 1910.147(c)(7)(i)(A) states: "Each authorized employee shall receive training in the recognition of applicable hazardous energy sources, the type and magnitude of the energy available in the workplace, and the methods and means necessary for energy isolation and control."

**E. The ALJ's Decision.**

Sofidel contested the citations, and a hearing was held before ALJ Sharon D. Calhoun on January 9 and 10, 2024. Dec. 2. On October 17, 2025, the ALJ issued a decision and order affirming the two citations at issue here and the proposed penalty of $15,625 each for those items. App'x 26.

The ALJ determined that Sofidel violated § 1910.147(c)(4)(i) because it failed to ensure that its employees utilized LOTO procedures while unjamming the Rewinder. App'x 16. In so finding, the ALJ rejected Sofidel's contentions that the standard did not apply to unjamming or rethreading the Rewinder. App'x 15. The ALJ found that the plain text of the standard supported the Secretary's interpretation that the Rewinder was a machine where "unexpected energization or startup" could occur and cause injury unless all hazardous energy sources were locked out. App'x 15.

In particular, the ALJ found that "[d]uring the unjamming of the R88 Rewinder, the rollers are not only energized but can unexpectedly startup." App'x 16. Rejecting Sofidel's argument that an operator could

not be exposed to the unexpected energization due to unjamming the Rewinder because there is an audible alarm and a delay before jogging can occur, the ALJ noted that "the record shows the R88 Rewinder was unjammed, and could be reverse jogged[] while the machine was energized and unexpectedly started up." App'x 17.

Additionally, the ALJ concluded that unjamming activities occurred pre-production, were not "integral to the use of the equipment for production," and were not a part of "normal production operations" because when the Rewinder jams, the machine shuts down and no longer performs its intended function of producing toilet paper. App'x 16. As such, the ALJ concluded that Sofidel did not prove that the minor servicing exception applied. App'x 17. Further, the ALJ found that Sofidel had knowledge of the violative condition because Giammarino, the onsite supervisor, Kuhner, and Sabine all "knew the R88 Rewinder was energized and not locked out when operators attempted to unjam it." App'x 19. The ALJ imputed Giammarino's knowledge to the company. App'x 20.

Having found that the LOTO standard applied to the Rewinder unjamming activities, the ALJ also determined that Sofidel violated

1910.147(c)(7)(i)(A) because it failed to train its operators on energy control procedures. App'x 22. The ALJ noted that the uncontroverted evidence shows that Sofidel trained its operators as "affected employees" instead of "authorized employees." App'x 22, 113.

Finally, the ALJ also found that Sofidel failed to establish the affirmative defense of unpreventable employee misconduct. The ALJ determined that Sofidel did not have "a work rule that effectively implemented the requirements of the standard" because operators were exposed to hazardous energy whether they engaged in one- or two-person jogging. App'x 20 (quoting *TNT Crane & Rigging, Inc.*, 2022 WL 2102910, *4 (OSHRC June 2, 2022)).

Sofidel petitioned the Commission for discretionary review of the ALJ's decision. App'x 43. The Commission denied the petition, and the ALJ's order became the Commission's final order. App'x 45.

## SUMMARY OF THE ARGUMENT

The ALJ correctly determined that Sofidel violated §§ 1910.147(c)(4)(i) and 1910.147(c)(7)(i)(A) and failed to establish the unpreventable employee misconduct defense. First, Sofidel failed to utilize LOTO procedures in violation of § 1910.147(c)(4)(i). The standard

applies to unjamming the Rewinder because the plain text of the LOTO standard defines "unjamming of machines or equipment" as an example of servicing and/or maintenance, and the unjamming activities exposed operators to the potential for an unexpected release of stored energy during both one-person and two-person jogging.

And, the ALJ properly concluded that Sofidel failed to establish that unjamming the Rewinder was exempt from the requirements of the LOTO standard under the "minor servicing" exception because unjamming activities did not take place during normal production operations, unjamming was not "minor" servicing, and the company did not provide effective alternative protection for operators unjamming the Rewinder.

Sofidel had knowledge of the violative conditions because its policies did not require LOTO to unjam the Rewinder, and multiple company supervisors knew that operators engaged in two-person jogging to unjam the Rewinder without utilizing LOTO procedures.

Second, Sofidel failed to establish the unpreventable employee misconduct defense. Sofidel did not present sufficient evidence that its purported two-person jogging rule was a thorough safety program

because the record shows that the company did not have a safety rule requiring LOTO during one-person jogging. Sofidel failed to prove that the program was adequately communicated through a single PowerPoint slide and a handbook that employees were not required to read. It failed to prove that Hill's conduct was unforeseeable, given that Hill had been taught to engage in two-person jogging by his on-the-job trainer and a prior supervisor, and the practice was rampant. And it failed to prove that the safety program was effective, given that employees regularly engaged in two-person jogging leading up to Hill's injury, and only one employee had previously been disciplined for engaging in this common practice.

Finally, Sofidel violated §1910.147(c)(7)(i)(A) because it did not provide its operators with LOTO training as authorized employees. Because the LOTO standard applies to the unjamming activities performed by the operators, and Sofidel did not prove the activities were exempt from the requirements of the standard, Sofidel was required to provide the requisite LOTO training under the standard for machine operators unjamming the Rewinder.

# ARGUMENT

## I. Standard of Review

This Court's review of the Commission's decisions "is a limited one." *Mountain State Contractors, LLC v. Perez*, 825 F.3d 274, 279 (6th Cir. 2016). The Commission's findings of fact must be upheld so long as they are supported by substantial evidence in the record. 29 U.S.C. § 660(a); *Mountain State Contractors*, 825 F.3d at 279. The Commission's legal conclusions must be affirmed unless they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *CME Elec., Inc. v. OSHA*, 221 F.3d 861, 865 (6th Cir. 2000).

## II. The ALJ Correctly Concluded that Sofidel Violated 29 C.F.R. § 1910.147(c)(4)(i) Because the LOTO Standard Applies to Unjamming the Rewinder Without Any Exceptions and Sofidel Had Knowledge of the Hazardous Conditions.

To establish a prima facie violation of an OSHA standard, the Secretary must show by a preponderance of the evidence that (1) the cited standard applies to the facts, (2) the requirements of the standard were not met, (3) employees had access to the hazardous conditions, and (4) the employer knew or could have known of the hazardous conditions

with the exercise of reasonable diligence. *Mountain State Contractors*, 825 F.3d at 279.

Section 1910.147(c)(4)(i) states that "[p]rocedures shall be developed, documented, and utilized for the control of potentially hazardous energy when employees are engaged in activities covered by this section." Unless an exception applies, a violation occurs where employers fail to ensure that employees exposed to potential unexpected energization of equipment during servicing and/or maintenance activities utilize LOTO procedures. *See Spirit Aerosystems, Inc.*, 25 BNA OSHC 1093, 2014 WL 7434582, *4 (No. 10-1697, 2014) ("The cited provision states that energy control procedures must not only be developed and documented—they must be utilized."). "In the preamble to the standard, OSHA 'specifie[d] that the employer ensure that the control measures are used by employees whenever they might be exposed to injury from the unexpected energization or start up of machines or equipment or the release of stored energy.'" *Id.* (quoting Control of Hazardous Energy Sources (Lockout/Tagout), 54 Fed. Reg. 36644, 36670 (Sept. 1, 1989)).

On review, Sofidel only contests two elements of the prima facie case: whether the standard applies to unjamming the Rewinder (element one) and whether it had knowledge of the violative conditions (element four).

**A. The ALJ Properly Determined that 29 C.F.R. § 1910.147(c)(4)(i) Applied to Unjamming the Rewinder Because the Unjamming Activities Were Servicing and/or Maintenance Under the Standard and Employees Were Exposed to Potential Harm from Unexpected Energization of the Machine.**

The LOTO standard "applies to the control of energy during servicing and/or maintenance of machines and equipment in which the *unexpected* energization or start up of the machines or equipment, or release of stored energy could cause injury to employees." § 1910.147(a)(2)(i) (emphasis in original); *see also Otis Elevator Co.*, 24 BNA OSHC 1081, 2013 WL 3998034, at *3 (No. 09-01278, 2013), *aff'd*, 762 F.3d 116, 126 (D.C. Cir. 2014).

The standard defines "[s]ervicing and/or maintenance" as:

> Workplace activities such as constructing, installing, setting up, adjusting, inspecting, modifying, and maintaining and/or servicing machines or equipment. These activities include lubrication, cleaning or *unjamming of machines* or equipment and making adjustments or tool changes, where the employee may be exposed to

the unexpected energization or startup of the
equipment or release of hazardous energy.

§ 1910.147(b) (emphasis added). Furthermore, "[e]nergization is
'unexpected' in the absence of some mechanism to provide adequate
advance notice of machine activation." *Gen. Motors Corp., Cpcg
Oklahoma City Plant*, 22 BNA OSHC 1019, 2007 WL 4350896, at *3
(No. 91-2834E, 2007).

Here, the ALJ correctly determined that 29 C.F.R. §
1910.147(c)(4)(i) applied to the unjamming of the Rewinder. First, the
plain text of the LOTO standard includes "unjamming of machines or
equipment" as one of many examples listed in the definition of
"servicing and/or maintenance."[12] *See* 29 C.F.R. § 1910.147(b).

Next, as noted by the ALJ, the unjamming activities exposed
operators to "the *potential* for an unexpected release of stored energy
that could cause injury to the [employee]." *See Otis Elevator Co.*, 2013
WL 3998034, at *3. The uncontroverted evidence established that the

---

[12] Although the standard does not apply to "normal production
operations," it does apply to "[s]ervicing and/or maintenance which
takes place during normal production," § 1910.147(a)(2)(ii), as discussed
*infra* at 29-31.

Rewinder has no audible alarm for the reverse button. *See Gen. Motors Corp., Cpcg Oklahoma City Plant*, 2007 WL 4350896, at \*3 ("Energization is 'unexpected' in the absence of some mechanism to provide adequate advance notice of machine activation."). Indeed, Hill and Superintendent Giammarino both testified that there was no alarm before the lower roller began to move after pressing reverse. App'x 137. Hill stated that he was surprised when the machine started up without warning. App'x 137, 144. The record, therefore, establishes that this unexpected release of energy to the Rewinder had the potential to harm employees, as evidenced by Hill's degloving injury to his left hand. *See Gen. Motors Corp., Cpcg Oklahoma City Plant*, 2007 WL 4350896, at \*3. As such, the ALJ correctly determined that § 1910.147(c)(4)(i) applies to unjamming the Rewinder.[13]

_____

[13] Sofidel overemphasizes the distinction between one-person vs. two-person jogging as it relates to an operator's potential harm from unexpected energization. Pet'r's Br. 23-25. Notwithstanding the fact that the record evidence on two-person jogging that occurred at the worksite is sufficient to establish the Secretary's burden of proving applicability, there is substantial evidence to support the ALJ's finding that a machine operator engaging in solo unjamming activities is still exposed to the potential of unexpected energization from the rollers because it was possible for an employee to press the reverse button,

## B. Substantial Evidence Supports the ALJ's Conclusion that Sofidel Failed to Establish the Minor Servicing Exception.

The LOTO standard exempts from coverage certain types of minor servicing that take place during normal production operations. 29 C.F.R. § 1910.147(a)(2)(i). The exception reads as follows:

> Minor tool changes and adjustments, and other minor servicing activities, which take place during normal production operations, are not covered by this standard if they are routine, repetitive, and integral to the use of the equipment for production, provided that the work is performed using alternative measures which provide effective protection (See subpart O of this part).

---

which would immediately start the machine with no alarm or delay, while their hands were in the machine. *See* App'x 20, 138, 164, 317. A single operator performing a one-person jog could still reach the powered rollers and inadvertently hit the reverse button due to the buttons' proximity. App'x 138, 164, 167, 317. Additionally, a second employee could operate the Rewinder, unbeknownst to the first employee physically clearing the jam, from the Rewinder's control panel or the HMI panel. App'x 204. The fact that workers may have *less* potential for harm from unexpected energization while one-person jogging does not negate the fact that the potential for harm still exists. *See Dayton Tire*, 23 BNA OSHC 1247, 2010 WL 3701876 at *5 (No. 94-1374, 2010), *aff'd in relevant part by*, 671 F.3d 1249 (D.C. Cir. 2012) (finding the LOTO standard "does not require the Secretary to quantify the specific risk level associated with such an event," and that "even momentary exposure to equipment that has not been fully de[-]energized and locked out poses a significant risk of serious harm or death.").

29 C.F.R. § 1910.147(a)(2)(ii) ("Note"). The Commission has distilled the minor servicing exception into three elements: servicing activities that (1) take place during normal production operations, (2) are minor, and (3) for which effective alternative protection is provided. *Westvaco Corp.*, 16 BNA OSHC 1374, 1993 WL 369040, *4-5 (No. 90-1341 1993). Examples are lubricating, cleaning, unjamming[,]and making minor adjustments and simple tool changes." Lockout/Tagout, 54 Fed. Reg. at 36661.

The ALJ correctly found that Sofidel failed to establish the minor servicing exception. First of all, Sofidel did not meet the threshold showing that the unjamming activities took place "during normal production operations." *See Westvaco Corp.*, 1993 WL 369040, *4-5 (noting that the question of whether the employer had established that the service activity at issue takes place during normal production operations is a threshold issue). The ALJ correctly found that unjamming the Rewinder preceded normal production operations and was not "integral to the use of the equipment for production," because the Rewinder automatically shuts down and can no longer perform its intended function of producing toilet paper. App'x 204; *see Matsu*

*Alabama, Inc.*, 25 BNA OSHC 1952, 2015 WL 6941348, at *8 (No. 13-1713, 2015), *aff'd*, *Matsu Alabama, Inc. v. Occupational Safety & Health Rev. Comm'n*, 670 F. App'x 699 (Mem) (11th Cir. 2016) (finding servicing activities were not made during normal production operations because the machines were shut down and were not being utilized to perform their intended production function).

Rather, when the Rewinder jammed, the machine had to be rethreaded and set up again. App'x 98, 113, 190. As held in *Westvaco*, if workers must set up a machine to run, these set-up activities cannot occur during normal production. *Westvaco*, 1993 WL 369040, at *4 ("[B]ecause the helper's adjustments constituted 'setting up,' they cannot, based on the standard's definition of that term, be considered to take place 'during normal production operations.'"). Indeed, Sofidel managers admitted the machine becomes inoperable during jams, except for the jog and reverse functions at issue here, and the machine cannot resume normal production until after the machine is unjammed and set up again for production. App'x 98, 110-11, 112, 152. Accordingly, because the jams take the machine out of normal

production and operators must set the machine up to run again, the minor servicing exception does not apply. *See Westvaco*, supra at *4.

Moreover, the preamble to the standard makes clear that the minor servicing exception was meant to cover "routine, repetitive actions which are integral to the operation of the equipment for production, and which are necessary to allow production to proceed *without interruption*." Control of Hazardous Energy Sources (Lockout/Tagout), 54 Fed. Reg. 36644, at 36662 (Sept. 1, 1989) (emphasis added). The preamble to the standard further noted that "minor servicing" only applies to minor tasks that "must be performed *as part of the production process*." *Id.* (emphasis added). Here, it is clear that unjamming the Rewinder was not "part of the production process" but was rather an "interruption" in the production process that is not covered by the minor servicing exception to LOTO requirements. While the preamble notes that "unjamming" can be a minor servicing activity under the exemption, it is included only where the unjamming occurs while the production process is in operation. This does not include, as here, scenarios where the process stops and workers must set the machine up again.

Although the ALJ did not reach the remaining elements—namely, whether unjamming the Rewinder was "minor" or whether adequate alternative protection was in place—the record clearly demonstrates that Sofidel failed to prove these elements as well.[14]

Unjamming the Rewinder was not "minor" because it was not "routine" or "repetitive." § 1910.147(a)(2)(ii) ("Note"). Although the standard does not define the term "routine," Merriam-Webster defines "routine" as a "regular course of procedure" or "habitual or mechanical performance of an established procedure." Merriam-Webster Online, https://www.merriam-webster.com/dictionary/routine (last visited May 9, 2025); *see Reynolds Packaging Kama, Inc.*, 22 BNA OSHC 1952, 2009 WL 3361403, at *6 (No. 08-1554, 2009) (ALJ) (considering minor servicing exception and defining "routine" activity as one that "must be performed as part of a regular and prescribed course of procedure and be performed in accordance with established practices.").

---

[14] Although the ALJ did not reach the second and third elements of the minor servicing exception, this Court could still affirm on these grounds. *See Campbell v. BNSF Ry. Co.*, 600 F.3d 667, 677 (6th Cir. 2010).

Jams occur for many reasons and in different sections of the Rewinder. App'x 98, 151. Because of the variety of jams, there is no one way to clear a jam, and the time to clear the machines varies greatly, from a few minutes to nearly eighty minutes. App'x 98-100, 103, 151, 225-44. Also, some jams required specialized employees called "tuners" to fix the problem. App'x 104. Accordingly, because there is no "regular course of procedure" to clear jammed paper and cores, unjamming is not a routine activity. *See Reynolds Packaging*, 2009 WL 3361403, at *6.

Finally, Sofidel also failed to prove that it provided effective alternative protection for operators unjamming the Rewinder. Its contention that its purported rule against two-person jogging and the interlocked door are effective alternative protection mechanisms is unpersuasive.

First, Sofidel did not prove that its rule prohibiting two-person jogging truly prevented the potential for unexpected energization. *See* § 1910.147(a)(2)(ii) ("Note"). The preamble to the LOTO standard and OSHA's LOTO Directive make clear that alternative measures must be effective and generally require compliance with OSHA's machine guarding requirements. "As the exclusion itself makes clear, the

employer must provide alternative measures which he/she can demonstrate will provide effective protection. This will generally involve compliance with OSHA's machine guarding requirements throughout the production process." 54 Fed. Reg. at 36662. OSHA's LOTO Directive also states that "Compliance with the machine guarding requirements of Subpart O is an example of such alternative measures." The Control of Hazardous Energy – Enforcement Policy and Inspection Procedures at 2-16 (CPL 02-00-147, Feb. 11, 2008) (the "LOTO Directive").

The Directive further emphasizes that "[u]nder no circumstances is any part of an employee's body ever permitted to be exposed within a hazardous area, such as the point-of-operation or in-going nip point area, during servicing and/or maintenance activities while the machine is running or energized." *Id.* at 2-22.

Sofidel's attempt to compare unjamming the Rewinder to unjamming a printing press is inapt. Pet'r's Br. 20-21. Sofidel failed to consider the following language from the standard's preamble:

> In a printing shop, when a printing press is being used to produce printed materials, there is often the need to make minor adjustments such as to correct for paper misalignment while the press is running. This is a part of the production process, and is subject to the machine guarding requirements. The use of remote control devices will keep

the employees from reaching beyond the machine guards. In addition, the use of inch (or jog) devices will permit machine speed control for test purposes. By contrast, however, printing presses may jam, requiring the employee to bypass the machine guards in order to reach the area of the jam and clear it. Although the need to unjam the machine comes about during normal production operations, it is a servicing activity which involves employee exposure to unexpected activation of the machine or release of energy, and as such, is covered by this Final Rule.

Lockout/Tagout, 54 Fed. Reg. at 36665. This example is more illustrative of the unjamming in the current matter because operators must unlock the interlocked door, bypass a guard, and reach their hands into "danger zones" to clear the jams.[15] §§ 1910.147(a)(2)(i),

_____

[15] Subsections 1910.147(a)(2)(ii)(A) & (B) state in relevant part:

> Servicing and/or maintenance which takes place during normal production operations is covered by this standard only if:
>
> (A) An employee is required to remove or bypass a guard or other safety device; or
>
> (B) An employee is required to place any part of his or her body into an area on a machine or piece of equipment where work is actually performed upon the material being processed (point of operation) or where an associated danger zone exists during a machine operating cycle.

(ii)(A) & (ii)(B). While the Secretary does not concede that unjamming activities related to a printing press are sufficiently similar to that of the Rewinder, nor is that fact borne out by the evidence in the record, the standard's preamble makes clear that unjamming of a printing press is covered.[16] *See id.*

Work rules are not adequate alternative protection from the hazard of unexpected energization because "administrative measures do not prevent employee exposure to unexpected start up as effectively as implementing lock out procedures or by any effective machine guarding." *Johnson Brass & Mach. Foundry, Inc.*, 2024 WL 5206740,

---

[16] Sofidel cites OSHA guidance and interpretative letters on minor servicing in the printing industry but conveniently leaves out key language in OSHA's guidance. *See Printing Industry: Lock Out/Tag Out and the essential elements of the inch-safe-service technique,* OSHA Interpretive Letter, 2004 WL 3320633, *3 (April 7, 2004). OSHA has repeatedly stated that not "all un-jamming, cleaning, lubricating, adjusting, plate/blanket changing, and paper webbing/paper roll changing operations in the printing industry were subject to the minor servicing exception." *See id.* More relevant to the current matter, OSHA's guidance states the following: "**Under no circumstances is an employee ever permitted to place any part of his or her body within a hazardous area, such as a point-of-operation, ingoing nip points, or around power transmission apparatus, while the equipment or machine is running or energized**." *See id.* (emphasis in original).

*15 (OSHRC Nov. 15, 2024) (ALJ); *Cf. Quebecor World – Salem Division*, 19 BNA OSHC 1627, 2001 WL 1083763, at *3 (No. 01-0031, 2021) (ALJ) (finding alternative protection method effective because it completely prevented the potential for injury caused by unexpected energization). The evidence plainly shows that workers disregarding the work rule was common practice. *See Crown Cork & Seal Usa, Inc.*, 23 BNA 1674 OSHC, 2011 WL 1290676 (No. 09-0973, 2011) (ALJ) (finding that instructions given to workers to not clean the rear of a machine did not provide effective alternative protection from unexpected energization because it was common practice for workers to clean the rear). Thus, Sofidel's purported rule against two-person jogging does not constitute adequate alternative protection because it allows employees to place their hands within the hazardous area of the Rewinder while the machine is energized, and it does not prevent exposure to the unexpected energization of the machine.

Second, the interlocked door was not an effective alternative because another employee could enter the Rewinder and energize the machine via the control panel without the first employee's knowledge. *See Quebecor World*, 2001 WL 1083763, at *4 (finding alternative

effective where energization could not occur without closing the interlocked gate, which would sound an audible alarm, alerting the worker). Additionally, a second employee could operate the Rewinder from the HMI panel while the first employee was still exposed in the danger zone. Engineering control measures, such as the interlocked door or other circuits "would provide alternative safeguarding measures with respect to the minor servicing exception <u>if</u> these devices are under the *exclusive control* of the employee performing the *minor servicing*." *See* LOTO Directive at p. 3-28. Notwithstanding the fact that the rollers are still energized while the interlocked door is open, the lack of exclusive control by the operators exposes them to the potential for unexpected energization. *See id.*

Thus, the minor servicing exception did not apply because unjamming the Rewinder was not part of normal production (but rather an interruption), was not routine, and the company did not provide adequate alternative protection. Sofidel's claim that the Secretary's interpretation of the minor servicing example is not entitled to deference under *Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024), Pet'r's Br. 18-19, is meritless for several reasons. First, *Loper Bright*

does not apply here. It overturned *Chevron* deference to agency interpretations of ambiguous *statutes*; it did not disturb *Kisor v. Wilkie*, 139 S.Ct. 2400 (2019), in which the Supreme Court reaffirmed that courts should defer to agencies' reasonable interpretations of their own ambiguous regulations. Second, no deference is necessary here in any event because the minor servicing exemption unambiguously does not apply to operators placing their hands in the hazardous area of the Rewinder while it is energized, particularly where no alternative protections were in place to prevent them from being injured by the unexpected energization of the machine. Finally, even if the minor servicing exception were ambiguous as applied to unjamming the Rewinder, the Secretary's interpretation of the standard is reasonable, and indeed the best reading of the standard, for all the reasons discussed herein. *See Martin v. OSHRC*, 499 U.S. 144, 154-157 (1991).

Sofidel's reliance on *Quebecor World* is misplaced. Pet'r's Br. 23-24. In *Quebecor World*, the ALJ found the LOTO standard inapplicable to changing plastic rolls and rethreading broken wrap on a machine that wrapped plastic around pallets of magazine paper. *See* 2001 WL 1083763 at *2. Those activities were done inside a "wrapper cage," in

which there was no possibility of unexpected energization harming an employee because the machine was fully de-energized while the employee was in the wrapper cage, and it was not possible for another employee to re-energize the machine. *See id.* at 3. Here, the Rewinder was not fully de-energized while the interlocked door was open, and it was possible for other employees to enter the Rewinder through the interlocked door, as illustrated by the frequent occurrence of two-person jogging, and pushing the "reverse" button would re-energize the machine without warning. App'x 95, 130. Additionally, the machine could be operated from the HMI panel. App'x 204.

This potential is also illustrated by a separate case against Sofidel involving the failure to implement LOTO procedures on a rewinder at a different facility. *Sofidel America*, No. 23-0204 (OSHRC June 17, 2024) (ALJ). In that case, one employee entered the rewinder through the interlocked door to perform solo jogging to unjam it, and then a second employee (unbeknownst to the first) hit a "reset" button that (like the "reverse" button) caused the machine's hazardous parts to activate without warning while the first employee's hands were in the machine, resulting in an employee injury. *Id.*

For these reasons, the ALJ correctly determined that the minor servicing exception did not apply, and therefore § 1910.147(c)(4)(i) required the company to ensure that machine operators unjamming the Rewinder utilized lockout/tagout procedures.

## C. Sofidel Had Knowledge of the Hazardous Conditions Because Multiple Managers Knew Operators Did Not Utilize LOTO Procedures While Unjamming the Rewinder.

"The fourth and final condition for a prima facie violation of the Act requires that the employer knew of the hazardous condition, or could have known through the exercise of reasonable diligence." *Mountain State Contractors*, 825 F.3d at 283. "The knowledge of a supervisor or foreman, depending on the structure of the company, can be imputed to the employer." *Id.*

Substantial evidence supports the ALJ's finding that Sofidel had knowledge of the hazardous conditions. *See Mountain State Contractors*, 825 F.3d at 283. First, the ALJ correctly found that Sofidel had actual knowledge of the hazardous conditions because its management was aware that two-person jogging to unjam the Rewinder was an ongoing, common occurrence, and operators did not utilize LOTO procedures

when engaged in unjamming activities. *See Mountain State Contractors*, 825 F.3d at 283. Kuhner, Frazier, and Bixler stated that two-person jogging was a known issue at the worksite. App'x 157, 184. Lombardi acknowledged that similar injuries had occurred at the worksite because of the practice. App'x 162-63. Bixler even stated that two-person jogging was beneficial. App'x 162, 169, 263. Also, Giammarino and Sabine knew that the Rewinder was not locked out when operators attempted to unjam the machine. App'x 111, 201.

Additionally, Hill testified that Bixler, his immediate supervisor, performed two-person jogging with Hill without utilizing LOTO procedures. App'x 139; *see Tampa Shipyards, Inc.*, 15 BNA OSHC 1533, 1992 WL 52938, at *6 (Nos.86–360, 86–469, 1992) ("An employee who has been delegated authority over other employees, even if only temporarily, is considered to be a supervisor for the purposes of imputing knowledge to an employer."). Hill's testimony, coupled with the voluminous evidence that multiple managers were aware of the rampant, ongoing occurrence of two-person jogging activities, significantly outweighs Bixler's testimony that Bixler had not done two-person jogging with Hill, or since 2019, which contradicted Bixler's own

statements to CO Eberts that wrap-ups were normally cleared with two people because it was more beneficial. App'x 139, 162, 169; 263.

For these reasons, the ALJ correctly determined that Sofidel had actual knowledge, through multiple company supervisors, that machine operators performed two-person jogging to unjam the Rewinder without utilizing LOTO procedures.

## III. Substantial Evidence Supports the ALJ's Conclusion that Sofidel Failed to Prove the Unpreventable Employee Misconduct Defense.

"In the Sixth Circuit, in order to successfully assert [the unpreventable employee misconduct] defense, an employer must show that it has a thorough safety program, it has communicated and fully enforced the program, the conduct of the employee was unforeseeable, and the safety program was effective in theory and practice." *Danis - Shook Joint Venture XXV v. Sec'y of Labor*, 319 F.3d 805, 812 (6th Cir. 2003). Further, "to be effective, the safety program must be designed such that, if followed, it would prevent the violations at issue." *Id.* "The employer must shoulder the burden of proving all four elements of the [unpreventable employee misconduct] defense." *Revoli Constr. Co., Inc.*, 19 BNA OSHRC 1682, 2001 WL 1568807, at *11 (No. 00-0315, 2001).

The ALJ correctly found that Sofidel failed to establish the unpreventable employee misconduct defense. First, Sofidel did not present sufficient evidence that its two-person jogging rule was a thorough safety program designed to prevent the violations at issue here. *See Danis -Shook Joint Venture XXV*, 319 F.3d at 812. As noted above, Sofidel's procedure for one-person jogging without LOTO violated § 1910.147(c)(4)(i), *supra* at p. 28 n.13, and the purported rule against two-person jogging was clearly not designed to prevent one-person jogging without LOTO. Indeed, the company admits that it did not require LOTO for one-person jogging. For this reason alone, the ALJ correctly determined that Sofidel's unpreventable employee misconduct defense fails.[17]

Second, substantial evidence supports the ALJ's determination that the purported rule against two-person jogging was not adequately communicated to employees. The program documentation of the rule consisted of one PowerPoint slide shown during classroom orientation

_____

[17] Although the ALJ did not reach the remaining elements of the affirmative defense of unpreventable employee misconduct, this Court could still affirm for the reasons explained herein. *See Campbell v. BNSF Ry. Co.*, 600 F.3d 667, 677 (6th Cir. 2010).

and one sentence in the employee handbook, which was fifty-four pages long. App'x 336, 394-97. Hill testified that he was told to "read [the handbook] on your own if you would like to," and his on-the-job trainer did not adequately communicate the two-person jog rule. App'x 144; *see Angel Bros. Enters., Ltd.*, No. 16-0940, 2020 WL 4514841, at \*4 (OSHRC July 28, 2020), *aff'd*, 18 F.4th 827 (5th Cir. 2021) (stating the Commission considers evidence of whether and how work rules were conveyed by an employer when evaluating whether the rules were adequately communicated to employees).

Third, even if a single PowerPoint slide and a single sentence in the handbook (that employees were not required to read) constituted adequate communication of a paper program prohibiting two-person jogging, there is no evidence that Hill's conduct was unforeseeable. On the contrary, the evidence overwhelmingly demonstrates that Hill had been engaging in two-person jogging since he started on-the-job training with the blessing of his trainer and managers. Indeed, his trainer taught him to do two-person jogging, and multiple supervisors had done two-person jogging with him. App'x 135, 139, 162, 165. And, as discussed *supra* at p. 43, multiple company supervisors were aware that

two-person jogging was a routine occurrence. Thus, it was entirely

foreseeable that Hill would engage in two-person jogging to unjam the

Rewinder. *See Jacobs Field Servs., N. Am., Respondent*, 2018 WL

7080228, *15 (OSHRC December 11, 2018) (ALJ) (holding that it was

"entirely foreseeable" that an employee was injured while doing what he

was told).

Fourth, there is no evidence that the safety program was effective

in theory or practice. "[T]o be effective, the safety program must be

designed such that, if followed, it would prevent the violations at issue."

*Danis-Shook Joint Venture XXV*, 319 F.3d at 812. As noted by the ALJ,

the two-person jogging rule was not designed to prevent employees from

violating the LOTO standard because it did not require operators to

utilize LOTO procedures, whether they were doing one-person or two-

person jogging. *See Valdak Corp. v. OSHRC*, 73 F.3d 1466, 1469 (8th

Cir. 1996) (to establish employee misconduct defense, an employer must

prove "it had a work rule in place which implemented the standard").

Furthermore, a single operator performing a one-person jog could still

reach the powered rollers and the jog/reverse buttons simultaneously or

even hit the reverse button inadvertently due to the proximity of the

buttons. App'x 138, 164, 167, 317. Also, a second employee could control the Rewinder from the HMI panel while the solo-jogging employee was still inside the Rewinder. App'x 204. Thus, as noted by the ALJ, operators were exposed to hazardous energy whether they engaged in one- or two-person jogging. App'x 20.

Moreover, Sofidel did not establish that it effectively enforced its purported two-person jogging rule. As noted above, Sofidel's management testified that two-person jogging frequently occurred up until Hill's workplace injury. App'x 157, 162, 194, 269. Even though two-person jogging was rampant, Sofidel only presented evidence that it issued one written warning to one employee the entire two and a half years before Hill's injury. App'x 123, 124, 132, 282, 319.

The company only began to terminate employees for two-person jogging *after* Hill's workplace injury. App'x 91-92. Hill was disciplined over two months following his return to work (after OSHA issued Sofidel the citations at issue here). App'x 129, 323. Post-inspection discipline is only relevant to the unpreventable employee misconduct defense when viewed in conjunction with pre-inspection discipline. *Sec'y of Labor v. Precast Servs., Inc.*, 17 BNA OSHC, 1995 WL 693954, at *2

(No. 19-2971, 1995) (holding that pre-inspection verbal warnings were insufficient to show adequate enforcement of safety rule despite post-inspection termination).

And as aforementioned, Hill performed two-person jogging with his trainer and his supervisor. *See Danis-Shook Joint Venture XXV*, 319 F.3d at 811. ("In cases involving negligent behavior by a supervisor or foreman which results in dangerous risks to employees under his or her supervision, such fact raises an inference of lax enforcement and/or communication of the employer's safety policy." (quoting *Brock v. L.E. Myers Co., High Voltage Div.*, 818 F.2d 1270, 1277 (6th Cir. 1987))). Accordingly, substantial evidence supports the ALJ's conclusion that Sofidel failed to establish the unpreventable employee misconduct defense.

**IV. Substantial Evidence Supports the ALJ's Finding that Sofidel Did Not Comply with 29 C.F.R. § 1910.147(c)(7)(i)(A) Because It Did Not Provide Adequate LOTO Training to the Operators Who Unjammed the Rewinder.**

Sofidel violated § 1910.147(c)(7)(i)(A) by failing to train the operators who routinely unjammed the Rewinder on the machine's LOTO policy as authorized employees. Section 1910.147(c)(7)(i)(A) states: "Each authorized employee shall receive training in the

49

recognition of applicable hazardous energy sources, the type and magnitude of the energy available in the workplace, and the methods and means necessary for energy isolation and control." The LOTO standard defines an affected employee as "[a]n employee whose job requires him/her to operate or use a machine or equipment on which servicing or maintenance is being performed under lockout or tagout, or whose job requires him/her to work in an area in which such servicing or maintenance is being performed." 29 C.F.R. 1910.147(b). An authorized employee is defined as "[a] person who locks out or tags out machines or equipment in order to perform servicing or maintenance on that machine or equipment." *Id.* "An affected employee becomes an authorized employee when that employee's duties include performing servicing or maintenance covered under this section." *Id.*

Here, for the reasons outlined in Section I, *see supra* pp. 25-36, the ALJ correctly determined that Hill and the other operators engaging in unjamming activities were authorized employees under the standard because they performed servicing or maintenance on the Rewinder and the minor servicing exception does not apply. *See supra* pp 25-36. As such, Sofidel was required to provide the employees with the LOTO

training for authorized employees prescribed by the standard. *See* § 1910.147(c)(7)(i)(A).

Because Sofidel admittedly did not train its operators on the energy control procedures for the Rewinder as authorized employees, substantial evidence in the record supports the ALJ's determination that Sofidel violated § 1910.147(c)(7)(i)(A).

## CONCLUSION

For the above stated reasons, the Court should deny Sofidel's

petition for review.

Dated: May 9, 2025                    Respectfully submitted,


JONATHAN L. SNARE
Acting Solicitor of Labor

EDMUND C. BAIRD
Associate Solicitor of Labor for
Occupational Safety and Health

LOUISE McGAULEY BETTS
Counsel for Appellate Litigation

/s/Joseph Quik
ATTORNEY
U.S. Department of Labor
200 Constitution Ave., NW
Suite S-4004
Washington, DC  20210
(202) 693-5703
quick.joseph.j@dol.gov

*Counsel for Respondent,*
*Secretary of Labor*

# CERTIFICATE OF COMPLIANCE

1. This document complies with the type-volume limitation prescribed in Fed. R. App. P. 32(a)(7)(b) because, excluding parts of the document exempted by Fed. R. App. P.32(f), this document contains 9,612 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point font size Century Schoolbook type style.

Dated:  May 9, 2025                    /s/ Joseph Quick
                                       ATTORNEY
                                       U.S. Department of Labor
                                       Office of the Solicitor
                                       200 Constitution Avenue NW
                                       Suite S-4004
                                       Washington, DC 20210
                                       (202) 693-5703
                                       quick.joseph.j@dol.gov

                                       *Counsel for Respondent,*
                                       *Secretary of Labor*

# CERTIFICATE OF SERVICE

I hereby certify that on May 9, 2025, I electronically filed the foregoing

using the court's CM/ECF system which will send notification of such

filing to the following:

J. Micah Dickie
Fisher Phillips, LLP
1230 Peachtree St., N.E., Suite 3300
Atlanta, GA 30309
Telephone: 404-260-3419
mdickie@fisherphillips.com

William E. Curphey
Curphey & Badger, P.A.
816 137th St., NE
Bradenton, FL 34212
Telephone: (727) 599-4785
billcurphey@gmail.com


Dated:  May 9, 2025                /s/ Joseph Quick
                                   ATTORNEY
                                   U.S. Department of Labor
                                   Office of the Solicitor
                                   200 Constitution Avenue NW
                                   Suite S-4004
                                   Washington, DC 20210
                                   (202) 693-5703
                                   quick.joseph.j@dol.gov

                                   *Counsel for Respondent,*
                                   *Secretary of Labor*