Case No. 25-3037

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

SOFIDEL AMERICA,

Petitioner,

v.

LORI CHAVEZ-DEREMER, Secretary of Labor,

Respondent.

## REPLY BRIEF OF PETITIONER SOFIDEL AMERICA

ON APPEAL FROM THE OCCUPATIONAL SAFETY AND HEALTH
REVIEW COMMISSION

SHARON D. CALHOUN
ADMINISTRATIVE LAW JUDGE

CURPHEY & DERSCH, PA
William E. Curphey (FL 0386741)
816 137th St NE
Bradenton, FL 34212-2753
Telephone: 727-599-4785
billcurphey@gmail.com

FISHER & PHILLIPS LLP
J. Micah Dickie (GA 324015)
1230 Peachtree St NE, Ste 3300
Atlanta, Georgia 30309
Telephone: 404-260-3419
mdickie@fisherphillips.com

*Counsel for Petitioner,*
*Sofidel America*

# I.  **TABLE OF CONTENTS**

I.  TABLE OF CONTENTS .................................................................................. i

II.  TABLE OF AUTHORITIES ........................................................................ ii

III.  ARGUMENT .............................................................................................. 1

a.  Whether the Substantial Evidence Supports the ALJ's Determination that 29 C.F.R. § 1910.147(c) Applied Because Employees Were Allegedly Exposed to Potential Harm from Unexpected Energization of the Rewinder. ........................ 1

    1.  Exposure During Reverse Jogging ............................................................. 2

    2.  Exposure During Forward Jogging ............................................................ 5

b. Whether Substantial Evidence Supports the ALJ's Conclusion that Sofidel Failed to Establish the Minor Servicing Exception. .............................................. 7

    1.  The ALJ Erred in Finding That Unjamming Was a Pre-Production Activity and Not Integral to Production. ............................................................ 7

    2.  There Is Substantial Evidence That Petitioner Meets the Other Elements of the Minor Service Exception During One-Person Jogging. ......................... 15

c. Whether There Is Substantial Evidence That Petitioner Had Knowledge of a Hazardous Condition. ......................................................................................... 18

d. Whether Sofidel Failed to Prove Its Employee Misconduct Defense. ............. 22

IV.  CONCLUSION .......................................................................................... 23

V.  CERTIFICATE OF COMPLIANCE ........................................................... 25

## II.    TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Campbell v. BNSF Ry. Co.*,
   600 F.3d 667 (6th Cir. 2010) ............................................................................15

*Matsu Alabama, Inc.*,
   25 BL OSHC 1952, 2015 WL 6941348 (No. 13-1713, 2015) (ALJ)...........11, 12

*Pompa v. Comm'r of Soc. Sec.*,
   73 F. App'x 801, 2003 WL 21949797 (6th Cir. 2003) ......................................18

*Reynolds Packaging Kama*,
   22 BL OSHC 1952, 2009 WL 3361403 (No. 08-1554, Sept. 1, 2009)..............16

*Westvaco Corp.*,
   16 BL OSHC 1374, 1993 WL 369040 (No. 90-1341, 1993) ......................11, 12

**Other Authorities**

29 C.F.R. § 1910.147(c)........................................................................................1

29 C.F.R. § 1910.147(c)(4)(i)...............................................................................23

29 C.F.R. § 1910.147(c)(7)(i)(A)..........................................................................23

54 FR 36644-01 (September 1, 1989) ...................................................................10

CPL 02-00-147 (Feb. 11, 2008)............................................................................11

https://www.oshrc.gov/alj-decisions-pending-commission-review/
   (last accessed May 28, 2025)............................................................................18

https://www.osha.gov/laws-regs/standardinterpretations/2004-04-07
   (last visited May 28, 2025) ..............................................................................11

## III.  ARGUMENT

### a.  Whether the Substantial Evidence Supports the ALJ's Determination that 29 C.F.R. § 1910.147(c) Applied Because Employees Were Allegedly Exposed to Potential Harm from Unexpected Energization of the Rewinder.

As an initial matter, the Secretary argues that Sofidel "overemphasizes the distinction between one-person vs. two-person jogging as it relates to an operator's potential harm from unexpected energization." (Sec. Br. at 28 n.13). On the contrary, the distinction between one- and two-person jogging makes all the difference, in part because the ALJ's decision regarding exposure to unexpected energization rests on exposure during reverse jogging, which, unlike regular jogging, does not have an audible alert before the machine starts moving. (A-014, Vol. I).

There are three jog modes, all of which are done within the Rewinder: forward at the control panel located inside the Rewinder, forward with a deadman switch located inside the Rewinder, and reverse at the control panel located inside the Rewinder. To perform the jogging function at the control panel that is inside the Rewinder, first the R88 Rewinder must be reset, then an employee must go back to the HMI panel to clear any alarms and badge in to enable the jog button, then go back into the machine and press the reset button on the control panel. (A-105, Vol. I [Tr. 120:10-121:9]; A-201, Vol. I [Tr. 497:19-500:22]). The R88 Rewinder also has a deadman forward jog switch inside the Rewinder so that employees can reach other parts of the machine and jog it as necessary while holding the deadman jog

switch, and if the employee releases the deadman switch, the jogging stops. The deadman switch also moves the rollers away from the pinch point. (A-105, Vol. I [Tr. 122:18-124:15]; A-111, Vol. I [Tr. 144:16-145:11, 145:16-146:13]; A-138, Vol. I [Tr. 254:1-21]; A-139, Vol. I [Tr. 257:11-21]; A-293, Vol. II). When the jog button is pushed at the panel inside the R88 Rewinder, or when it is pushed via the deadman switch inside the Rewinder, an audible alarm sounds three times, there is a delay, and then the machine can be jogged while holding the button down. (A-105, Vol. I [Tr. 120:24-121:10], A-111, Vol. I [Tr. 145:1-11]; A-138, Vol. I [Tr. 254:1-21]; A-186, Vol. I [Tr. 439:9-15], A-201, Vol. I [Tr. 497:25-498:9, 499:18-500:10]). Reverse jogging can only be done at the panel that is inside the Rewinder and not via the deadman switch. (A-111, Vol. I [Tr. 146: 19-147:2]; A-138, Vol. I [Tr. 254:17-24]; A-144, Vol. I [Tr. 276:12-23, 278:11-24, 292:3-19]; A-186, Vol. I [Tr. 439:20-440:22]; A-293, Vol. II). The only way to jog the machine is inside the Rewinder. *Id.*; (A-202, Vol. I [Tr. 502:5-9]).

## 1. Exposure During Reverse Jogging

First, for reverse jogging, contrary to the Secretary's assertions, reverse jogging can only be done at the panel inside the Rewinder, not via a deadman switch that is also inside the Rewinder and, because of distance, that employee does not have access to any zone of danger while that employee is hitting the reverse jogging button on the control panel inside the Rewinder. (A-111, Vol. I [Tr. 146:19-147:2];

A-138, Vol. I [Tr. 254:17-255:11]; A-144, Vol. I [Tr. 276:12-23, 278:11-24]; A-148, Vol. I [Tr. 292:3-19]; A-186, Vol. I [Tr. 439:20-440:22]; A-202, Vol. I [Tr. 502:5-9]; A-293, Vol. II). To the extent there is scant evidence in the record that an employee could inadvertently hit the reverse jog button that is inside the Rewinder while simultaneous reaching toward a zone of danger in the Rewinder during a one-person reverse jog (A-164, Vol. 1 [Tr. 348:12-349:4]), this would not constitute substantial evidence of exposure to unexpected energization because no measurements were done by OSHA or introduced at the hearing for the Rewinder to demonstrate this alleged possibility. (A-163, Vol. I [Tr. 348:3-9] (noting no measurement even for distance between buttons)). There is also not substantial evidence on whether or not an employee can actually reach the zone of danger while pressing the reverse jog button, because the zone of danger is approximately five feet from the reverse jog button (A-163, Vol. I [Tr. 343:18-344:4], A-202, Vol. I [Tr. 500:14-22, 502:5-24]), and evidence of employees being able to reach a zone of danger while one-person reverse jogging was explicitly contradicted by Sofidel. (A-144, Vol I [Tr. 276:18-23, 278:16-24]; A-146, Vol. I [Tr. 285:3-9]; A-187, Vol. I [440:18-22]). Thus, there is not substantial evidence of inadvertent exposure to unexpected energization during reverse one-person jogging, and certainly no evidence of exposure to unexpected energization during reverse one-person jogging by operational necessity.

3

Second, regarding two-person, reverse jogging, the accident happened when two employees were both inside the Rewinder, nearly shoulder to shoulder, and one hit the reverse jog button. (A-125, Vol. I [Tr. 200:2-11]; A-136, Vol. I [Tr. 241:2-25]). The Secretary admits that the injured employee, Christian Hill, had his hand inside the machine on or next to the rollers but still told another employee, Dezmond Perkins, who was beside Hill, to start reverse jogging the Rewinder. (Sec. Br. at 11). And while Hill testified that he was surprised by the Rewinder starting up during reverse jogging at the time of the accident, Hill also testified on questioning from the Secretary that *he told Perkins, standing beside Hill, to start the Rewinder* and merely did not know if Perkins would hit the button immediately upon request or (inexplicably) wait. (A-141, Vol. I [Tr. 265:21-266:4]). On cross examination, Hill also testified that he expected the machine to start up during reverse jogging. (A-139, Vol. I [Tr. 256:1-6]). This is not substantial evidence of exposure to unexpected energization.

On whether or not the movement of the lower roller instantly upon the start of reverse jogging was expected by Hill such that LOTO should have applied, the Secretary's seeks to argue two conflicting points of view: (1) that Hill often performed two-person jogging, including reverse jogging, and (2) also that somehow Hill did not expect the instant movement of the roller when reverse jogging when his co-worker, who was right next to him, hit the jog button (as opposed to regular

jogging where there is an alarm that sounds three times before movements of the roller). The record simply does not support, by substantial evidence, the ALJ's finding that there was exposure to unexpected energization during reverse jogging. Therefore, the LOTO standard does not apply, and the citation items should be vacated.

### 2. Exposure During Forward Jogging

As to exposure to unexpected energization of the Rewinder during forward jogging, the Secretary also speculates that "a second employee could operate the Rewinder, unbeknownst to the first employee physically clearing the jam, from the Rewinder's control panel or the HMI panel. App'x 204." (Sec. Br. at 29 n.29).

First, the Rewinder cannot be jogged or in any way operated from outside the machine while the interlock door is open, whether at the HMI panel or from some other location, because when the Rewinder interlock door is opened, it deenergizes the machine, and there is no evidence to the contrary. (A-092, Vol. I [Tr. 67:5-19, A-170, Vol. I [372:12-19], A-194, Vol. I [471:20-24], A-196, Vol. I [476:8-11, 477:7-12], A-198, Vol. I [484:11-17, 485:7-22, 486:9-13], A-200 [493:22-494:2], A-201, Vol. I [497:19-24]). As noted above the only way to jog the machine is inside the Rewinder. There is also no evidence in the record that employees performed unjamming with the interlocked door closed such that the HMI could be used to reset and then turn on the machine.

Second, as to whether a second employee could operate the Rewinder from inside the Rewinder at the control panel without the first employee knowing, this is the scenario regarding Hill's accident. The Secretary takes two positions, without evidence and in direct contradiction with one another: (1) that the space inside the Rewinder is small enough where one employee can both hit the reverse jog button while simultaneously being in a zone of danger; and (2) that a second employee could energize the machine without the first employee knowing—all while both employees are standing in that same space next to each other. The record does not contain substantial evidence regarding this type of exposure, even if the ALJ found Hill credible that he truly did not expect energization when he told Perkins, who was standing next to Hill, to hit the jog button.

Thus, there is not substantial evidence of employee exposure to unexpected energization for the Rewinder during jogging of any type, all three types of which must be done from inside the Rewinder.[1] Accordingly, the two citation items should be vacated.

---

[1] As to one-person, forward jogging, the ALJ did not find, there is no evidence, and the Secretary does not argue that there is employee exposure to unexpected energization during one-person, forward jogging, given that when the jog button is pushed at the panel inside the R88 Rewinder, or when it is pushed via the deadman switch, an audible alarm sounds three times, there is a delay, and then the machine can be jogged while holding the button down. (A-105, Vol. I [Tr. 120:24-121:10]; A-111, Vol. I [145:1-11]; A-138, Vol. I [254:1-21]; A-186, Vol. I [Tr. 439:9-15]; A-201, Vol. I [497:25-498:9, 499:18-500:10]).

**b. Whether Substantial Evidence Supports the ALJ's Conclusion that Sofidel Failed to Establish the Minor Servicing Exception.**

      **1. The ALJ Erred in Finding That Unjamming Was a Pre-Production Activity and Not Integral to Production.**

First, the Secretary asserts that production stops during a jam. (Sec. Br. at 9). The Secretary admits, as the evidence shows, that "[i]t can take anywhere from a few minutes to eighty minutes to unjam the Rewinder." (Sec. Br. at 11). Substantial evidence shows that, contrary to the ALJ's finding, such jams or wrap ups take place during production, not during the set-up phase. For example:

> THE WITNESS: On a bad day, I mean it could wrap up every ten minutes. So it -- the paper is volatile. It depends on what we're running. We run toilet tissue, kitchen towel. Kitchen towel is a little more – you know, it's stronger. The tensile strength of kitchen towel is stronger than toilet tissue. Toilet tissue is -- I mean it can --it's not easy. So there's super-soft, standard; there's --
> THE COURT: So let's talk about the toilet tissue. How often does that cause a problem? And I'll just say a wrap-up problem.
> THE WITNESS: I'm sorry, so how often does it wrap up and cause an issue?
> THE COURT: Yes.
> THE WITNESS: Every shift. So a lot.
> THE COURT: Okay. Every shift, I mean does it --as it's cycling or whatever, like can you say like every 20 minutes, every hour?
> THE WITNESS: I can't speak specifically because it's circumstantial, really. I mean it will wrap up a minimum once an hour, I believe.

(A-096, Vol. I [Tr. 84:4-25]). Similarly:

> THE COURT: And you said they wrap up a lot. I'm just trying to get some kind of understanding of what you mean by "a lot."
> THE WITNESS: I would say ten to 20 times is a lot for me.
> THE COURT: A shift or --
> THE WITNESS: Per 12-hour shift. I'm sorry.

THE COURT: Per 12-hour shift.
THE WITNESS: Yeah.
. . .
THE WITNESS: Can I clarify one thing? So when I was an operator though, I've had a machine wrap up every 15 minutes in a 12-hour shift. And that's I don't know how many wrap-ups but --
THE COURT: And what was that machine producing?
THE WITNESS: Toilet tissue, yeah.

(A-096, Vol. I [Tr. 86:11-87:3]). Other evidence shows jams were cleared and the machine restarted in twenty-one (21) minutes, twenty-five (25) minutes, and twelve (12) minutes (A-100, Vol. I [Tr. 101: 7-17, 102:15-19]). One piece of testimony in the record notes a machine being down for 80 minutes. (A-100, Vol. I [Tr. 102:9-11]). To the extent the Secretary seeks to distinguish evidence regarding wrap ups from jams to isolate the frequency of jams to or to say they are not part of production or integral to production, such a position is contrary to the way evidence was presented by the Secretary at the hearing before the ALJ, with the Secretary eliciting testimony regarding wrap ups and wraparounds and then following up with questions regarding jams as though the two occurrences were one in the same. Here are two examples of the Secretary's presentation of evidence on this point:

Q. Okay. A wrap-up, it's like paper is jammed in there, right, there are different spots that they're jammed?
A. To me a jam and a wraparound are two different things. The paper is wrapped around, so it's not jammed; it's wrapped around a roller, causing that roller to flag a sensor. A jam to me is when something is jammed inside of a -- you know, two rollers and then you can't get it out.
Q. Okay. But it could get stuck within – paper could get stuck within -- between two rollers and just get jammed in there?

8

A. Yeah.

Q. Right. So some -- some are what maybe are stuck in there as jammed, and some are what you're considering wrap-ups, right?

A. Yes.

Q. Okay. Now, the types of jams that there are there, wrap-ups, they're not all the same, right?

A. No.

Q. And it's -- there's no one way to clear a jam or a wrap-up?

A. No, it's circumstantial.

. . .

Q. And how does -- how does the supervisor or the operator figure out what part of the machine is jammed?

A. Well, the interface, the HMI, is -- it'll tell you where a paper break or a wraparound occurred, and you go to that section and kind of see.

(A-097, Vol. I [Tr. 87:6-88:18]). Similarly:

Q. All right. And then the start -- the next one starts at 21.50.15, that's two rows up, it says "wrap-up cliche roll." What does that mean, a wrap-up on a cliche roll?

A. Okay. So we're on 20110, right?

Q. 21.50.15 start time.

A. So that's what I was explaining earlier. So the cliche roll is the one with the glue. It wrapped up somewhere on that roller, the width of that roller. I don't know for sure.

Q. All right. And it took 21 minutes to clear up the jam and get this operation back and running?

A. By the looks of it, yes.

(A-100, Vol. I [Tr. 100:22-101:9]). Clearly, jams and wrap ups happen during the production process while Sofidel is producing toilet paper, and clearing jams and wrap ups are done during production and integral to the production process so that Sofidel can continue producing toilet paper.

In the face of this obvious fact, the Secretary argues, and the ALJ found, that because the Rewinder shuts off automatically and because it can no longer be

producing toilet paper while employees clear these jams, the clearing of jams is now taking place outside of the production process. Importantly, if this Court were to affirm this portion of the Commission ALJ's decision, it would have three immediate, adverse effects on employers nationwide.

First, if clearing paper jams is no longer considered to be service and maintenance done during production—no matter the circumstances—producers of toilet paper and related products would be economically devastated at a time when competitive pressures against them from producers outside the United States are ever-increasing. Deprived of the use of the minor service LOTO exception whenever their machinery jams or has paper wrap ups, employers like Sofidel would be at a severe competitive disadvantage in having to perform full LOTO where the minor service exception otherwise has applied for nearly forty years. The Secretary's position in this matter is surprisingly arbitrary, given that the Secretary has long recognized that the minor service exception plays a vital role in economic output, noting in the preamble to the LOTO rule that "if the servicing operation is routine, repetitive and must be performed as part of the production process, it is obvious that lockout or tagout cannot be performed, because these procedures would prevent the machine from economically being used in production." Control of Hazardous Energy Sources (Lockout/Tagout), 54 FR 36644-01 (September 1, 1989); *see also Printing Industry: Lock Out/Tag Out and the essential elements of the inch-safe-*

*service technique*, OSHA, https://www.osha.gov/laws-regs/standardinterpretations/2004-04-07 (last visited May 28, 2025). OSHA's directive on LOTO also provides the following example regarding the printing industry:

> In the printing industry, . . . the following . . . minor servicing activities [are] commonly performed during normal production operations: 1. Clearing of *certain* types of paper jams; 2. Minor cleaning, lubricating, and adjusting operations; 3. Certain plate and blanket changing tasks; and 4. In some cases, paper webbing and paper roll changing.

*The Control of Hazardous Energy-Enforcement Policy and Inspection Procedures*, Directive No. CPL 02-00-147 (Feb. 11, 2008) (emphasis in original).

The Secretary cites no bedrock principle of law for why the ALJ should be affirmed on this point, or why the change in the Secretary's position regarding these paper jams and wrap ups, except for one Commission decision *Westvaco Corp.*, 16 BL OSHC 1374, 1993 WL 369040, at *3 (No. 90-1341, 1993) and one non-mandatory Commission ALJ decision, *Matsu Alabama, Inc.*, 25 BL OSHC 1952, 2015 WL 6941348, at *7 (No. 13-1713, 2015) (ALJ). However, as more fully discussed in Sofidel's Appellant Brief (and argued in Sofidel's post-hearing brief before the ALJ), both these cases are inapposite to this matter, because, unlike the employer in *Westvaco* or even the employer in *Matsu Alabama, Inc.*, Sofidel is not making a number of adjustments or various repairs under the minor service exception to the Rewinder, and this case is about unjamming material or paper wrap-

11

ups, *not repairs and adjustments*. Sofidel was not setting up the Rewinder for a production run at the time of the accident or at times described in the record when its operators clear a paper jam, unlike the employer in *Westvaco* that was engaging in set-up activities: "The judge found that the helper's adjustments of the shaft heads to accommodate each customer's specifications in anticipation of the next production run is 'setting up,' or, as defined in the standard, 'work performed to prepare a machine or equipment to perform its normal production operation.' We agree." *Westvaco Corp.*, 1993 WL 369040, at *5. *Matsu Alabama, Inc.* involved extensive repairs by an employer trying to use the minor service exception, *not jams*: "Matsu's tool and die makers periodically perform a number of adjustments and repairs to mechanical presses, including changing the dates stamped onto the manufactured parts, repairing broken punches, replacing springs, and sharpening punches." *Matsu Alabama, Inc.*, 2015 WL 6941348, at *7. By contrast, Sofidel's jams happen during a production run, and unjamming is conducted *to continue Sofidel's current production run*.

Neither of these cases cited by the Secretary and relied upon by the ALJ in her decision held that, because machinery is stopped to conduct service and maintenance, the service and maintenance was conducted outside of normal production and thus outside the ambit of the minor service exception. The Secretary cites no other authority for this argument or to support the ALJ's decision on this

point, because there is none. This finding by the ALJ in this case was not supported by substantial evidence, and the ALJ's finding was contrary to established law on the minor service exception as to what constitutes production and what activities are integral to production. A change in the law of this magnitude—that jams of the kind Sofidel experiences can no longer be considered to be fixed during the production process and are no longer integral to production—would create instability for employers like Sofidel nationwide.

Second, maybe even more importantly, should the Secretary prevail on this point in this matter, there is nothing to stop the Secretary from using this case as precedent to cite employers unjamming machinery utilizing the minor service exception in contexts other than paper jams, eviscerating the minor service exception for every industry that relies upon the minor service exception. In fact, the Secretary must be aware of this possibility, and both the absence of a limiting principle in her arguments in this matter and her preference for no oral argument to clarify or limit the Secretary's position make clear that the Secretary welcomes an anti-employer interpretation of the minor service exception from this Court that flies in the face of well-established precedent and regulatory interpretation by the Secretary. The Secretary's argument deserves no deference, and this Court should reject it by, at a minimum, reversing the finding of the ALJ that Sofidel's unjamming activities in

this case were not done during production and instead holding that such activities are done during production and are integral to production.

Third, the ALJ's finding may also rest on the Rewinder's automatic shut-off feature—as if the automatic shut-off of the Rewinder when it detects a jam or wrap up removes the subsequent unjamming activity from production and therefore from the minor service exception. Such a holding, if affirmed, would create negative incentives, leading some employers to eliminate or change automatic shut-off features, which are in place for employee safety and to protect the production machinery. Neither the ALJ's decision nor the Secretary's brief cite legal authority for the proposition that a machine's automatic shut-off/shutdown feature makes subsequent servicing or maintenance activity to remedy the cause of that automatic shutdown ineligible for the minor service to LOTO or that somehow the servicing and maintenance after that automatic shutdown changed the activity from production to setup.[2] No authority is cited for this proposition because, again, there is no such

_____

[2] The Secretary also briefly asserts that the ALJ held that rethreading is not covered by the LOTO standard (Sec. Br. at 19). However, the ALJ made no such finding regarding threading, and threading at Sofidel is not part of the ALJ's findings or central to the Commission's decision. Moreover, contrary to the Secretary's assertion that when the Rewinder jams it must be rethreaded (Sec. Br. at 31), the record shows that after wrap-up rethreading is "circumstantial" such that this only occurs if the entire ply, top or bottom breaks all the way. (A-095, Vol. I [Tr. 82:4-13, 140:7-11]). There is some evidence regarding maintenance coming out to fix the "threading belts" to rethread the Rewinder (A-101, Vol. I [Tr. 103:5-17]), but operators like Hill or tuners do not perform this task without first calling maintenance. (A-101, Vol. I [Tr. 103:18-104:14]). The OSHA's CSHO testified that

authority to cite for this proposition, and this Court should not create such authority by affirming the ALJ's decision on this point. Instead, this Court should reject the ALJ's finding and the Secretary's argument for an extreme narrowing of the minor service exception and, at a minimum, hold that a machine that automatically stops during or after a jam does not remove subsequent unjamming from having been done during production as an activity integral to production.

2. **There Is Substantial Evidence That Petitioner Meets the Other Elements of the Minor Service Exception During One-Person Jogging.**

First, regarding whether this Court may reach other grounds not reached by the Commission ALJ, the Secretary cites *Campbell v. BNSF Ry. Co.*, 600 F.3d 667, 677 (6th Cir. 2010). *Campbell* and its antecedents involved a *de novo* review inapplicable here. Thus, the Commission ALJ's decision should not be affirmed on a basis not reached by the ALJ.

However, to the extent this Court reaches other elements of the minor service exception, substantial evidence shows that Sofidel met the other elements of minor service exception in this case. In support for the contrary position, the Secretary first notes that unjamming the rewinder was not minor because it was not routine or repetitive. (Sec. Br. 33). In support of the task not being routine, the Secretary cites

_____

there was rethreading, but it is unclear where that knowledge came from or when such rethreading happened. (A-180, Vol. I [Tr. 413:5-414:6]). As noted above, the ALJ did not make findings regarding rethreading.

one non-binding Commission ALJ decision that notes a routine activity is one that is "part of a regular and prescribed course of procedure and [is] performed in accordance with established practices." (*Id.* (*citing Reynolds Packaging Kama, Inc.*, 2009 WL 3361403, at *1 (No. 08-1554, Sept. 1, 2009) (ALJ)). However, that is the only case phrasing the minor service exception in that manner as to imply one unified, established practice for a maintenance task is required to fall under the exception.[3] Here, the record is replete of descriptions of how Sofidel employees unjam the Rewinder and that such tasks happen multiple times a day. Thus, the unjamming conducted by Sofidel described in the record is routine and repetitive as required by the minor service exception. *Reynolds*, even if binding on this Court, does not dictate a contrary result, as that case was not about whether an activity was routine or repetitive and instead hinged on the activity not being done during production. *Reynolds Packaging Kama,* 22 BL OSHC 1952, 2009 WL 3361403, at *6 (No. 08-1554, Sept. 1, 2009) (finding that burnouts of machinery were from contaminant not inherent to the production process).

The Secretary then asserts that the interlocked door was not an effective means of protection for Sofidel's employees as required by the minor service protection. In

---

[3] Even *Reynolds Packaging* summarily dispatches the Secretary's argument here that Sofidel's paper jams during production is somehow not part of production in the minor service exception context: *"*When a machine jams on the product it is actually producing, it is part of the normal production operation." 2009 WL 3361403, at *6.

support, the Secretary asserts, without any citation to the record, that "the interlocked door was not an effective alternative because another employee could enter the Rewinder and energize the machine via the control panel without the first employee's knowledge." (Sec. Br. at 38, 41). As noted above, the Secretary again takes two positions in direct contradiction with one another: that the space is small enough inside the Rewinder where one employee can both hit the reverse jog button while simultaneously being in a zone of danger **and** that a second employee could energize the machine without the first employee knowing, all while both employees are standing in that same space. There is not substantial evidence in the record that operational necessity or inadvertence would give Sofidel notice of employees within the zone of danger in these circumstances.

The Secretary also argues again that a second employee could operate the panel outside the machine, thus defeating the interlocked door. As noted above, the record shows that this is not possible while the interlocked door is open, and there is no evidence in the record to indicate otherwise or that there has been an issue like that at this worksite. [4]

---

[4] The Secretary also improperly argues that the Rewinder's interlocked door is inadequate for alternative protective measures because of a separate OSHRC matter involving Sofidel. (Sec. Br. at 41). First, there is no evidence in the record that the Rewinder in this case is exactly the same as the machinery in the other matter or evidence on the jogging features and interlocked doors to make a comparison between these machines. Thus, the Secretary's argument regarding other worksites should be rejected.

The Secretary's speculative and contradictory positions in its briefing demonstrate that the ALJ's decision is not based on substantial evidence and that the ALJ's decision must be reversed.

### c. Whether There Is Substantial Evidence That Petitioner Had Knowledge of a Hazardous Condition.

The Secretary mischaracterizes the evidence of Sofidel's alleged knowledge of two-person jogging prior to the accident, as there is not substantial evidence of Sofidel's knowledge of a hazardous condition. First, as to any testimony regarding two-person jogging (of any kind), starting with evidence about Hill and his initial trainer, Todd Featheringham, such alleged two-person jogging was well outside the statute of limitations for the Act. This is because Hill began work at Sofidel in March 2021, worked with Featheringham for six months, and the accident happened on September 21, 2022. (A-006, Vol. I; A-245, Vol. I A-132, Vol. I [Tr. 227:7-23]).

---

Second, that other matter was not introduced into the record here, and, therefore, cannot be considered by this Court in determining whether substantial evidence supports the final decision of the Commission; instead it "may [be] consider[ed] . . . only for the purpose of determining whether a remand is appropriate." *Pompa v. Comm'r of Soc. Sec.*, 73 F. App'x 801, 804, 2003 WL 21949797, at *3 (6th Cir. 2003).

Finally, Sofidel must now bring to this Court's attention what the Secretary neglected to mention—Sofidel's Petition for Discretionary Review in that matter was, unlike this matter, directed for review by the full Commission. That matter is currently pending before the Commission. *See* https://www.oshrc.gov/alj-decisions-pending-commission-review/ (last accessed May 28, 2025). Therefore, the other matter is not a final order of the Commission.

Sofidel's knowledge cannot be based on Featheringham, who did not testify at the hearing. Similarly, any evidence of two-person jogging by Hill and Gordon Cardwell was well outside the statute of limitations for the Act, as Hill only worked for Gordon Cardwell for three months. (A-132, Vol. I [Tr. 229:17-230:12]). Thus, Sofidel's knowledge cannot be based on Cardwell, who also did not testify at the hearing. Therefore, to the extent there is evidence of knowledge of two-person jogging by Featheringham or Cardwell, that knowledge stopped by December 1, 2021, at the latest, well before the accident or even the issuance of the citations in this matter.

Second, as to knowledge imputed to Sofidel through Bixler, while the Secretary points out that Bixler originally told OSHA during the inspection that it "would be beneficial"[5] to have a second person during clearing of wrap ups, the Secretary omits the very next sentence Bixler told OSHA during the inspection: "There have been times where people have done it before that way, *but they have switched and gone away from that all together in the past year*." (A-260, Vol. I (emphasis added)). Clearly, Bixler did not have knowledge of two-person jogging at the time of the accident.

---

[5] The Secretary's brief does not quote Bixler exactly so that the Secretary's brief can read "was beneficial" to imply this was done at the time of the accident. (*Compare* Sec. Br. at 17-18 *with* A-260, Vol. I). There is no evidence that Bixler knew of two person jogging, much less a hazard from one person jogging, at the time of the accident.

Third, regarding any imputation from Joe Frazier, while the Secretary notes that Supervisor Joe Frazier gave a statement during the inspection that two-person jogging occurred leading up to the accident, in his testimony at the hearing in this matter, Frazier testified that two person jogging occurred in 2019 at some point, that it was prohibited since 2019, and people have been disciplined since then. (A-189, Vol. I [Tr. 449:3-450:2]). Frazier further clarified his statement to OSHA during the inspection, noting that at the time of his statement he was telling OSHA what he had heard, that he never actually saw two-person jogging, and that his line was a solo line where he only performed one-person jogging, testimony which was consistent with what Frazier told the OSHA inspector during her inspection. (A-190, Vol. I [Tr. 455:20-459:25], A-266, Vol. I).

Fourth, regarding any imputation from Randy Kuhner and Marco Lombardi, the Secretary did not elicit testimony of Kuhner's knowledge from him directly on the stand, instead relying on the CSHO's testimony that, per her refreshed memory from her notes during an opening conference, that Lombardi and Kuhner indicated that two-man jogging had been done prior to the accident. (A-180, Vol. I [Tr. 415:6-10]). The CSHO's notes, however, appear to be regarding the status of Sofidel's investigation into the incident and do not detail when or how Lombardi or Kuhner knew of two-person jogging or the circumstances of said jogging. (A-276, 277, 279,

Vol. II). Similarly, Lombardi testified at the hearing that he had never seen two-person jogging and that it was strictly prohibited. (A-145, Vol. I [Tr. 280:15-282:1]).

Thus, neither Lombardi nor Kuhner knew of a hazard regarding two-person jogging. Additionally, while there are many references to reverse jogging in the record, the only evidence of the frequency of reverse jogging is from Hill that it is "hardly ever use[d]." (A-134, Vol. I [Tr. 236: 9-14]). Therefore, there is not substantial evidence supporting a finding that Sofidel had knowledge of a hazardous condition related to reverse jogging (of any kind).

As to forward jogging, as noted above and discussed more fully in Appellant's brief, it is not enough for the evidence to show that jogging occurred to affirm the citation item. The substantial evidence shows that there is no unexpected energization regarding one-person, forward jogging due to the alarm before the machine starts. As for forward jogging by a second employee unexpectedly, it is not possible for operation of any kind to be done from the HMI panel with the interlocked door open, and there is no evidence in the record of any unknown or unexpected use of the HMI panel to jog the Rewinder occurring at this worksite.

Thus, there is not substantial evidence that Sofidel had or could have had knowledge of this potential hazard or exposure to employees, as it would not be reasonably predictable or foreseeable for that to happen.

**d. Whether Sofidel Failed to Prove Its Employee Misconduct Defense.**

Contrary to the Secretary's argument, two-person jogging was actually prohibited by Sofidel. Evidence that the injured employee, Hill, was not terminated after his injury was shown to be a policy of grace by Sofidel for employees who suffered injuries on account of their own misconduct. (A-128, Vol. I [Tr. 212:12-18]). The Secretary makes much of the fact that Hill was fired by Sofidel after Hill again performed two-person jogging after he recovered from his injuries from his first two person jogging incident. (Sec. Br. at 12-13 & n.4). The Secretary asserts that Hill's repeat offense of two-person jogging and termination for that repeat offense is somehow evidence that Sofidel's safety program was not effective. If Hill was not deterred by his injury to not perform two-person jogging again, surely Sofidel's prohibition and training against two-person jogging cannot by that fact alone be said to be ineffective. Similarly, while the Secretary highlights some testimony that seems to say any terminations for two-person jogging were after Hill's accident, there is substantial evidence that Sofidel prohibited two-person jogging prior to the accident, trained employees on that prohibition both initially and then on the job, and that its policy and practice was to terminate employees performing two-person jogging. (A-113, Vol. I [Tr. 153:22-154:5, 154:18-155:8]; A-124, Vol. I [Tr. 195:8-25]; A-125, Vol. I [Tr. 200:20-201:16]; A-128, Vol. I [Tr. 211:5-25]; A-130, Vol. I [Tr. 221:11-222:14]; A-141, Vol. I [Tr. 263:16-264:6,

264:17-265:1]; A-146, Vol. I [Tr. 285:21-25]; A-170, Vol. I [Tr. 374:2-5]; A-184, Vol. I [Tr. 430:11-22]; A-189, Vol. I [Tr. 449:24-450:1]). Moreover, to the extent there is a lack of discipline records for two-person jogging, that absence only supports other evidence noted above in the record that Sofidel's supervisors had no knowledge of two-person jogging leading up to Hill's accident. Sofidel met its burden to show employee misconduct as to two-person jogging by a preponderance of the evidence, and the ALJ erred in finding otherwise.

## IV.   **CONCLUSION**

WHEREFORE, Petitioner respectfully requests that the Commission's Decision and Order be reversed regarding its finding that Petitioner violated 29 C.F.R. § 1910.147(c)(4)(i) and 29 C.F.R. § 1910.147(c)(7)(i)(A) and that Citation 1 Item 3 and Citation 1 Item 4 against Petitioner be vacated.

Respectfully submitted by:

*/s/ Micah Dickie*
J. Micah Dickie (GA 324015)
FISHER & PHILLIPS LLP
1230 Peachtree St NE, Ste 3300
Atlanta, Georgia 30309
Telephone: 404-260-3419
Facsimile: 404-240-4249
Email: mdickie@fisherphillips.com

*/s/ William E. Curphey*
William E. Curphey (FL 0386741)
CURPHEY & DERSCH, PA
816 137th St NE

Bradenton, FL 34212-2753
Telephone: 727-599-4785
Email: billcurphey@gmail.com

*Counsel for Petitioner Sofidel America*

## V.     CERTIFICATE OF COMPLIANCE

1.     This reply brief complies with the type-volume of limitation of Rule 32(a)(7)(B)(ii) of the Federal Rules of Appellate Procedure because it contains 5,995 words as counted by Microsoft Word, excluding the sections of the brief exempted by Rule 32(f) of the Federal Rules of Appellate Procedure and Sixth Circuit Rule 32(b).

2.     This reply brief complies with the typeface requirements of Rule 32(a)(5) of the Federal Rules of Appellate Procedure and the type-style requirements of Rule 36(a)(6) of the Federal Rules of Appellate Procedure because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

By:     */s/ Micah Dickie*_____
        J. Micah Dickie (GA 324015)


Dated: May 30, 2025.

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing has been sent to the following via electronic mail:

Louise McGauley Betts
betts.louise@dol.gov, OSH-SOL@dol.gov
Heather R. Phillips
phillips.heather@dol.gov
Joseph J. Quick
quick.joseph.j@dol.gov
US Department of Labor
Office of the Solicitor
200 Constitution Ave NW Ste 4004
Washington, DC 20210

John X. Cerveny
jcerveny@oshrc.gov
OSHRC
1120 20th St NW Ste 980
Washington, DC 20036-3419

This the 30th day of May, 2025.

*/s/ Micah Dickie*
J. Micah Dickie (GA 324015)